MARY EARECKSON GRACE ET AL. *v.* JACOB W.
THOMPSON ET AL.
F. LEIF EARECKSON ET AL. *v.* JACOB W.
THOMPSON ET AL.

[Nos. 93, 94, October Term, 1935.]

*Decided January 16th, 1936.*

The cause was argued before BOND, C. J. URNER, OF-FUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*James Morfit Mullen,* for Mary Eareckson Grace and Ethel D. Eareckson, appellants in No. 93.

*R. Contee Rose,* for F. Leif Eareckson and others, appellants in No. 94.

*Arthur W. Machen, Jr.,* and *H. Vernon Eney,* with whom were *Armstrong, Machen & Allen* on the brief, for Jacob W. Thompson and others, appellees.

OFFUTT, J., delivered the opinion of the Court.

On October 17th, 1918, William A. Thompson, a resident of Baltimore City, executed a valid will disposing of a substantial estate which included both real and personal property. On September 10th, 1920, he died, the will was probated, and letters issued to Frederick C. Heighe, his executor and trustee.

The provisions of the will pertinent to the questions presented by this appeal are these: "I direct that the

net income from my Estate be applied to the maintenance of my wife Florence V. Thompson during her life, my desire being that she be supported in the same style or manner as at present or as near the same as possible for her life time. * * * From and after the death of my said wife, I direct that my estate so held in Trust be divided equally between my brothers and sisters or their descendants as the case may be *per stirpes* not *per capita.*"

At the time the will was executed the nearest living relative of his blood was his sister, Mary R. Weedon, who died on February 20th, 1924. His only brother, Samuel Groome Thompson, had died on February 14th, 1918, another sister, Sarah Matilda Eareckson, died June 22nd, 1892, and his only other sister, Elizabeth M. Rankin, had died December 25th, 1897. His wife, the life tenant, Florence V. Thompson, died January 1st, 1935.

On September 28th, 1921, Mary R. Weedon executed a valid will in which she undertook to dispose of what she assumed was her share of the estate of William A. Thompson remaining after the death of the life tenant. In that will, after several bequests which are not material here, she left the entire residue of her supposed share in her brother's estate, in varying amounts, to her nieces and nephews, by far the larger part of it going to the descendants of her sister Sarah Matilda Eareckson.

In 1930, Frederick C. Heighe filed in the Circuit Court of Baltimore City a petition requesting that court to assume jurisdiction of the trust and relieve him of his duties as trustee. The court assumed jurisdiction as prayed, and substituted the Continental Trust Company as trustee.

On June 4th, 1935, following the death of Mrs. Thompson, the substituted trustee filed a petition in that case in which it requested the court to pass a decree "construing said Will, determining which of the brothers and sisters of William A. Thompson and which of the descendants of a deceased brother or sister are or were entitled to a share of the property held in trust by

your Petitioner and to whom the share of any brother, sister of descendant is now payable or deliverable and fully administering said trust." As a result of subsequent proceedings, the court decreed that the estate of William A. Thompson be divided into three parts, that one part be distributed to the descendants of Samuel Groome Thompson, one to the descendants of Elizabeth M. Rankin, and the third to the descendants of Sarah Matilda Eareckson. The effects of that decree was to exclude the legatees of Mary R. Weedon, as such, from sharing in the estate, and certain of those legatees and Kate R. Eareckson, executrix of the will of Mary R. Weedon, have taken this appeal.

The single question which it presents is whether, under the will of William A. Thompson, Mary R. Weedon took a vested interest in his estate which she could dispose of by will. If she did, the estate should have been divided into four parts, one of which would have been distributable to the legatees of Mary R. Weedon; if she did not, her legatees have no interest in the estate, and the trial court properly directed it to be divided into three parts and distributed *per stirpes* to such persons living at the death of the life tenant as were the descendants of deceased sisters and the brother of William A. Thompson.

The determination of that issue depends upon the meaning to be given the expressions "from and after" and "divided equally between my brothers and sisters or their descendants as the case may be *per stirpes* and not *per capita,*" which the testator used to dispose of the estate remaining at the termination of the life estate. When the will was executed, he had no brother, for his only brother had died months before, and he had but one sister, for his other two sisters had died many years before. Ordinarily, when one says that he has a brother or a sister, it is assumed that he means a living brother or sister, but the testator could not have meant that, for he had but one living sister and no living brother. Because of that situation, the expression is susceptible of several different interpretations; one, that he in-

tended it to include all his brothers and sisters living or dead, and the descendants then living of those who were dead; another, that he meant it to describe a class of persons living at the death of the life tenant, which should include his sister, if living at that time, and the descendants then living of his brother and the sisters who had died prior to the execution of the will; another, that he intended to describe his brother and sisters severally and individually, substituting for those who were dead their descendants. In determining which if any of those interpretations should be adopted, in view of the ambiguity inherent in the words, resort may be had to certain rules of construction, which are helpful as the product of common sense and common experience. One is that the whole context of the will must be considered, effect given to every word, and the whole construed so as to harmonize and reconcile its several parts. *Miller on Construction of Wills* sec. 11, and cases there cited. Another is that "the court will put itself in the testator's place, in his armchair; will see the circumstances that he saw; appreciate his surroundings as he appreciated them; and then give to the language he has used in his will the meaning which these circumstances and these surroundings indicate he intended that language to have." *Id.*, sec. 12. A third is that where the language permits different interpretations, the court will be diligent to ascertain which meaning was intended, in order that the will may prevail rather than fail for uncertainty. 69 *C.J.* 91. Others are that the will itself is a dictionary from which the meaning of the words used in it is to be ascertained (*Miller, Construction of Wills*, p. 84; 28 *Laws of England,* "*Wills*" sec. 1259) ; that nontechnical words are to be taken in their ordinary, proper, and grammatical sense unless it clearly appears that the testator intended to use them in another sense and that sense can be ascertained (*Miller, Construction of Wills*, p. 84) ; that technical words are to be given their correct meaning unless the contrary appears from the context (*Id.* p. 86), although in determining whether such words were used

in their technical sense the knowledge and skill of the draftsman in the use of such terms may be considered.

In defining the policy which should guide the approach of the expositor of a will, Jarman states: "In the construction of wills the most unbounded indulgence has been shown to the ignorance, unskilfulness, and negligence of testators: no degree of technical informality, or of grammatical or orthographical error, nor the most perplexing confusion in the collocation of words or sentences, will deter the judicial expositor from diligently entering upon the task of eliciting from the contents of the instrument the intention of its author, the faintest traces of which will be sought out from every part of the will, and the whole carefully weighed together." *Jarman on Wills,* *p. 326. These rules, naturally, have no binding or exclusive force, but are mere guides to aid in the discovery of what is, wherever the construction of a will is in issue, the supreme law of the case, the intention of the testator. Once that is ascertained, in so far as it is lawful, it must be given effect, and even such settled and established rules of construction as that which declares that the law favors the earliest vesting of estates must yield to it.

Another and perhaps the most important rule, subordinate only to that which recognizes the controlling force of the testator's intent, favors the early vesting of estates.

Turning to the will itself, the primary inquiry is the meaning which the testator intended to attach to the words "from and after" and "my brothers and sisters or their descendants." At the time he executed it, the persons nearest to him by blood or affinity were his wife and his sister, Mrs. Weedon. Mrs. Weedon at that time was seventy years of age, without children or descendants, and Mrs. Thompson was sixty-seven years of age. His first concern was to provide an income for his wife which would enable her to live in comfort, and, to accomplish that, he directed that the net income of his entire estate be applied to her maintenance during her

life. In disposing of the remainder of his estate, the testa-
tor did not look beyond his brothers and sisters and their
descendants, nor is there anything in the will to sug-
gest that he intended that his only living sister should
have any less or different interest in his estate than the
descendants of his deceased brother and sisters. He knew,
of course, that Mrs. Weedon would leave no descendants,
and if he meant by the words quoted above to designate
a class to be composed of persons living at the death
of the life tenant, he also knew that Mrs. Weedon would
take no interest in his estate unless she survived the life
tenant, and that while his brother and his other sisters
left descendants, Mrs. Weedon would leave none. It is
highly improbable that he intended any such result. There
was no apparent reason why he should have preferred
her to the nephews and nieces any more than that he
should have preferred them to her. They were all widely
separated. He lived in Baltimore, Mrs. Weedon in Queen
Anne's County, and the nephews and nieces in Maryland,
Iowa, Virginia, and California. In so far as he thought of
them at all, it was probably as descendants of his brother
and sisters rather than as individuals. His natural wish
would have been to have his property, after it had served
its purpose in protecting the only person in whom he
appears to have had a deep and present interest, go to
his sister and to the descendants of the brother and the
sisters who had died, *per stirpes*. So that when he direct-
ed that his property "be divided equally between my
brothers and sisters or their descendants as the case may
be," he naturally meant that each brother and sister
should be the origin of a *stirps* or stem and that one share
of his estate should go to each such *stirps*.

Assuming that that was the intention of the testator,
it may also be assumed that he intended that such shares
should vest at his death and not at the death of the life
tenant, first, because the law favors the earliest vesting
of estates (*Miller on Construction of Wills*, sec. 227,
*Plitt v. Peppler,* 167 Md. 252, 256, 173 A. 35, 36), and (2)
because such a presumption is consistent with the general

intent of the will that the estate should go ultimately to the descendants of his deceased brother and deceased sisters and to his living sister *per stirpes.*

The rule favoring the early vesting of estates, is said by Mr. Miller, in his guarded and helpful work on the construction of wills, to be: "Estates will be held to be vested wherever it can fairly be done without doing violence to the language of the will. To make them contingent there must be plain expressions to that effect or such intent must be so plainly inferable from the terms used as to leave no room for construction. In doubtful cases the interest should be held to be vested rather than contingent, unless the instrument under consideration does not admit of such construction. The general principle is that any devise or bequest in favor of a person or persons *in esse,* whether such persons be individualized or treated as a class, confers an immediately vested interest upon the death of the testator, although the time of possession or enjoyment may be postponed, unless there be some clearly expressed desire or some manifest reason for suspending or deferring the time of vesting." *Miller, Construction of Wills,* sec. 227. And Judge Urner for this court in *Plitt v. Peppler, supra,* said: "As the law favors an early vesting of estates, and as the estate in remainder under consideration in this case was devised and bequeathed to the testator's children by name, its vesting should be referred to the time of his death rather than to the time appointed for the division of the estate, unless the will clearly indicates an intention that the remainder should not vest until the later period."

Appellees, however, suggest a different construction, because, they say, (1) the Maryland law is that "where a will refers to the death of a legatee, or to survivorship among legatees, the period referred to is, if there is a precedent life estate, not the death of the testator, but the expiration of the life estate"; and (2) that the use of the words "from and after" indicate postponement of vesting until the termination of the particular estate.

Their first proposition is too broadly stated. There is no rule which gives to a mere reference to the death of a legatee the effect of postponing the vesting of an estate in remainder until the death of a life tenant, although, where a gift is made of a particular estate and then over to survivors, the period of survivorship is ordinarily referred to the period of distribution or the termination of the particular estate, and that is the rule stated by Miller (*Construction of Wills*, sec. 274), cited by appellants.

To bring the clause within that rule it is said that the use of the words "or," "as the case may be" and "from and after the death of my wife" and "descendants" mean the same thing as though the testator had said that at the death of the life tenant the estate should go to the survivors of a class. A sufficient answer would be that he did not say that, and that, when the words are read in their proper setting and together instead of separately, it is apparent that he did not mean that. As pointed out by Miller in the passage cited by appellees (*Construction of Wills*, sec. 280). "Or" has been construed to mean "in case of the death," when it introduces a substantial bequest, but here there is no substitution, nor is there any sound reason for attributing that meaning to "or" as it appears in the context in issue. The gift to the nephews and nieces was direct and not substitutional, and the reference to the testator's brothers and sisters was for the purpose of identifying those nephews and nieces as the objects of the gift, not to substitute them for "brothers and sisters" who had died before the will was made. It is said in *Reiff v. Strite*, 54 Md. 298, 304: "The disjunctive word 'or' clearly implies substitution; that is, it is taken as meaning that the gift over by way of substitution should take effect in case of the death of the first legatee before the time when the legacy became absolutely and indefeasibly vested in him." That statement illustrates perfectly the distinction between "or" as a word of substitution, and as a mere particle introducing an explanatory or descriptive phrase. Its use is

undoubtedly awkward and elliptical, but the ordinary man, not befogged by legalistic doubts, would have little difficulty in reaching the conclusion that what the testator meant was that his estate should be equally divided among his sister and the descendants of his deceased brother and sisters. *Words and Phrases,* First, Second, Third and Fourth Series; *Miller, Construction of Wills* sec. 280; *Reiff v. Strite, supra;* 46 *C.J.* 1124-1126. That conclusion is strengthened by the addition of the words "as the case may be." What the testator attempted to do was to describe in a single unhappy phrase his sister and the descendants of his deceased brother and sisters, and his manifest purpose in adding words "as the case may be" was to make it apply indifferently to each object, that is, to the living sister who neither had nor could have descendants, and to the descendants of brothers and sisters who had died.

In the case of *Reiff v. Strite, supra,* cited in support of a different conclusion, the gift over after a particular estate was direct, and the alternative introduced by the word "or" was a substitute for that direct gift; here there is a direct gift only.

It is stated in 4 *Words and Phrases,* First Series, 2986, as a preface to a collection of cases, that "The words 'from and after,' or like expressions used in wills as relating to the termination of the life estate, do not postpone the vesting of the estates in remainder until the death of the life tenant, but rather refer to the period when the remaindermen would become entitled to the estates in possession."

Tiffany, in his work on *Real Property,* states: "It is a well settled rule that a limitation will not be construed as creating a contingent remainder if it can possibly be construed as creating a vested one. This general rule has been applied in connection with a considerable number of expressions implying futurity of time, or contingency, which, instead of being construed as conditions precedent, are regarded merely as expressions employed by the testator or settlor in carrying on the series of

limitations. Thus in the case of a limitation to A for life, and 'on,' 'at,' 'from,' 'after,' or 'in the event of' A's death, to B, the words in quotation are regarded, not as conditions precedent, but as merely descriptive of the event on which the remainderman may be expected to acquire the right of possession, and the remainder is consequently vested." Volume 1, sec. 138.

In *Jarman on Wills,* \*p. 794, it is said: "A leading distinction is, that if futurity is annexed to the substance of the gift, the time of vesting is suspended; but if it appears to relate to the time of payment only the legacy vests instanter." And a postponement of payment or distribution will more readily be held not to prevent an early vesting where it is for the convenience of the estate, as where a fund is bequeathed to one for life, and at his death to be distributed among individuals or a class. *Underhill, Law of Wills,* sec. 866. So that while the so-called general rule, that a direction to divide and pay over at some future time annexes futurity to the substance of the gift, is widely recognized, the exception that where the postponement is for the convenience of the estate it will not prevent an early vesting is certainly as well established. 69 *C.J.* 606.

In stating the rule, the text-writers almost invariably use words carrying an implication that where possession of the legacy is conditioned upon the occurrence of a future event, such as the termination of a particular estate, until the event occurs vesting is suspended, unless a contrary intent is found. In applying that rule to particular cases, in order to determine whether the testator intended the gift to be contingent upon survivorship at the time of distribution, or whether he intended that the right to enjoy it should become fixed and certain at his death, but that enjoyment merely should be postponed until the termination of a particular estate, importance is attached to the use of such phrases as "from and after," not as conclusive, but as a significant index of the testator's intention. If the phrase "from and after" is accompanied by such words as "then," the

conclusion that the testator intended to defer vesting until the period of distribution is strengthened (69 *C.J.* 604), and on the other hand the absence of such words, the failure of the testator to limit the estate over in the event of the death of the first legatee before that period, and the fact that the postponement of distribution is for the benefit of the estate, tend to weaken it. *Id.; Miller, Construction of Wills,* sec. 230; *Tayloe v. Mosher,* 29 Md. 443, 454; *Martin v. Cook,* 129 Md. 195, 201, 98 A. 489. Moreover, in applying those rules, consideration is to be given the rule that the law favors the earliest vesting of estates.

From this maze of rules, exceptions, and presumptions, no principle has issued which, when applied to the infinitely varied phraseology of wills, will lead certainly and definitely to uniform or like results. Consequently, the cases dealing with the question of whether in using words of futurity the testator meant to refer to the period of vesting, or to enjoyment merely, are in no sense harmonious.

In *Booth v. Eberly,* 124 Md. 22, 24, 91 A. 767, the testatrix provided that "from and after" the death of the life tenant the estate should "go" to her son, but if he should die without issue, then over. It was held there that the estate vested at the death of the life tenant, because that intention appeared from the context. In *McClurg v. Myers,* 129 Md. 112, 98 A. 491, the language was that "from and immediately after" the death of the life tenant, the estate should "pass to" his descendants, but if he died without descendants "then and in that event that the whole of said estate and property shall pass to and become the absolute estate and property of" a certain named beneficiary. It was held that those words created a "contingent remainder of inheritance." In *Safe Deposit & Trust Co. v. Carey,* 127 Md. 593, 96 A. 796, 797, the testatrix left the residue of her estate to her husband for life and "from and immediately after" his death she gave and bequeathed it to her daughter if she survived the life tenant, and if she did not, then to her children

or descendants. It was held "that no vested estate was intended to be given until after the death of the life tenant." In *Poultney v. Tiffany*, 112 Md. 630, 632, 77 A. 117, the language was that "from and immediately after" the death of the life tenant, the estate was to become the property of the testator's children and their heirs, etc. It was held that the estates devised to the children vested in interest at the death of the life tenant. In *Wilson v. Bull*, 97 Md. 128, 136, 54 A. 629, a like result was reached by discovering the intent of the testator from the context. And it was held in *Lee v. O'Donnell*, 95 Md. 538, 52 A. 979; *Cherbonnier v. Goodwin*, 79 Md. 55, 58, 28 A. 894; *Mercantile Tr. & Dep. Co. v. Brown*, 71 Md. 166, 169, 17 A. 937; *Larmour v. Rich*, 71 Md. 369, 18 A. 702; and in *Bailey v. Love*, 67 Md. 592, 11 A. 280, that words importing futurity related to the substance of the gift rather than to its enjoyment. But running through all of those cases is the principle that such expressions as "from and after" a future event, when used with respect to the distribution of an estate upon the expiration of a particular estate, do not necessarily prevent vesting, but that they are to be considered in connection with all other parts of the will in determining whether the testator intended to incorporate them in the substance of the gift, and, in any such an inquiry, weight is to be given to the rule that the law favors the earliest vesting of estates. That rule is often referred to as though it were a rule of property, to be substituted for the intention of the testator, whereas it is a rule of construction and may only be invoked to aid (59 *C.J.* 597), never to defeat, the intention of the testator. So where "the intention of the testator cannot be reached with reasonable certainty and there is doubt and difficulty," it may be invoked. *Miller, Construction of Wills*, sec. 228; 69 *C.J.* 597; *Underhill on Wills*, sec. 861.

So in *Tayloe v. Mosher*, 29 Md. 443, 450, it was held that, where there is doubt and difficulty as to the intention, resort may be had "to settled rules of construction. The most important of these * * * is that the law favors

the vesting of estates," and in connection with that statement, that "where words of futurity are employed they are not to be regarded as importing contingency or as postponing the period of vesting, if they point merely to deferred possession or enjoyment."

In *Wilson v. Pichon*, 162 Md. 199, 159 A. 766, it was held that a devise over at the death of the life tenant was vested at the death of the testator, and the same result was reached with respect to a similar devise in *Lee v. Waltjen*, 141 Md. 450, 119 A. 246, in which Judge Urner for this court reviewed the decisions dealing with the application of the rule favoring the early vesting of estates to cases in which phraseology importing futurity was employed in connection with gifts over to take effect in possession upon the termination of life estates. The conclusions reached in those cases are consistent with the decisions in *Cole v. Safe Dep. & Trust Co.*, 143 Md. 90, 121 A. 911; *Swift v. Cook*, 133 Md. 651, 105 A. 869; *Williams v. J. C. Armiger & Bro.*, 129 Md. 222, 98 A. 542; *Brian v. Tylor*, 129 Md. 145, 98 A. 532; and with cases collected in *Miller on Construction of Wills*, sec. 231, note 2, in which the remainders vested at the earliest period, and also with cases cited in section 232, note 2, of the same work, in which the remainders did not vest at the earliest period. The result reached in cases such as *Wilson v. Pichon, supra,* is consistent with the following expressions in *Mercer v. Safe Deposit & Trust Co.*, 91 Md. 102, 116, 45 A. 865, 868: "The deed manifesting in its provisions no evidence of having been conceived and executed with any direct reference to subjecting the grantor's property to ultimate limitations or to creating and protecting future interests in the property, but rather for the personal purposes of the grantor himself, as already indicated, there would seem to be no good reason for imputing to him a purpose, when limiting his property over after the main object of his deed had been served, of having a care for remote and uncertain objects of his bounty, rather than of providing that the limitations should have the effect to immediately vest his prop-

erty in those who were nearest to him in blood and kinship, and who would more naturally be objects of his consideration."

The testator in this case apparently intended to create a class to be composed of his only living sister and of the descendants of his deceased brother and sisters (*Maddox v. State*, 4 H. & J. 539; *Plummer v. Shepherd*, 94 Md. 466, 51 A. 173; *Blackstone v. Althouse*, 278 Ill. 481, 116 N.E. 154; *Underhill on Wills*, p. 480, sec. 720), all of whom had at the testator's death a present natural capacity to take and hold the estate. The only apparent reason why the estate was not given to them immediately upon his death was that he intended that it should be used for the support of his wife during her life. Once that object was accomplished, it is consistent with his situation and the language of the will that the estate should at once be distributed to the members of the class, who were to be ascertained at his death and not at the death of the life tenant. The will discloses no possible intention of preserving the interests of remote and uncertain relations in his estate, but, on the contrary, it is consistent with an intention of having it go to those who were at the time he executed it nearest him in blood and kinship, and in whom he would naturally be most interested. The postponement of possession was for the convenience of the estate, not of the legatees, and he made no limitation over beyond the class. To such a case the rule of early vesting is peculiarly applicable, and it follows that Mary R. Weedon took a vested interest in the estate of the testator at his death. The estate should therefore have been divided into four parts, one of which should have been distributed to her legatees.

It follows that the decree appealed from must be reversed, and the case remanded for further proceedings in accordance with the views expressed in this opinion.

*Decree reversed and cause remanded for further proceedings in accordance with the views expressed in this opinion, with costs to the appellant.*