987 A.2d 60

**Lydia FRIEDMAN, et al.**

v.

**Jerome B. HANNAN.**

**No. 3 Sept.Term, 2009.**

Court of Appeals of Maryland.

Jan. 14, 2010.

330

Stephen S. Winegrad (Winegrad, Hess, Friedman & Levitt, LLC, Owings, MD), on brief, for Petitioners.

F. Gregory Shepperd, Baltimore, MD, for Respondent.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, Judge.

In this case we interpret Section 4–105(4) of Md.Code (1974, 2001 Repl.Vol.) Estates & Trusts Article ("ET"), which directs that provisions in a will "relating to the spouse" be revoked upon divorce from that person. We hold that the automatic revocation provision of ET Section 4–105(4) is not limited to bequests to a former spouse, and may include bequests to a former spouse's family members. A court should utilize the terms of the will and circumstances surrounding its execution to determine whether a bequest "relat[es] to the spouse" within the meaning of Section 4–105(4).

On appeal de novo from the Orphans' Court for Baltimore City, the Circuit Court for Baltimore City was called upon to construe the will of James Patrick Hannan ("Decedent"). The Decedent was married at the time he executed the will, but was divorced before his death. There is no dispute that after the divorce, all testamentary bequests made to Decedent's former spouse were revoked by operation of ET Section 4–105(4). The question at issue involves the status of Decedent's bequests to "those surv[iv]ing immediate family members of my Wife[.]" The former spouse's immediate family members, (Lydia Friedman, Patricia Tolley, Barbara Graves, Genia Covert, Kelley Gallagher and Kimberly Shike [collectively, "Friedman"]) appealed from the trial court's decision that the marital dissolution revoked their legacies. The Court of Specials ("CSA") affirmed, and we, in turn, affirm the intermediate appellate court.

## FACTS & LEGAL PROCEEDINGS

The facts in this case are simple and uncontested. On June 5, 1981, James Hannan married Anna Zelinski.[1] No children

---

1. During her marriage to Decedent, Zelinski's name was Anna Marie Covert Hannan.

were born to them during the marriage. At some point, the two separated, and later divorced on February 6, 2001. As part of the separation, both parties entered into a property settlement agreement. Zelinski testified that Decedent met all of his obligations under that agreement.[2] Decedent subsequently died on September 10, 2006. He had never remarried.

This action involves a will that Decedent executed during his marriage to Zelinski ("the Will"),[3] the relevant provisions of which state:

> *ITEM TWO:* I appoint as Executor of this, my Last Will and Testament, provided she shall survive me, my Wife, ANNA MARIE COVERT HANNAN. In the event my Wife preceedes [sic] me in death, I appoint my Brother, KEVIN HANNAN as Executor of this Will.
>
> *ITEM THREE:* I give and bequeath to my Wife, ANNA MARIE COVERT HANNAN, provided she survives me, all of my possessions. . . .
>
> *ITEM FOUR:* Should my Wife, ANNA MARIE COVERT HANNAN, and myself die together by accident or otherwise, the estate is to be handled by LYDIA ELIZABETH COVERT FRIEDMAN and KEVIN HANNAN. All real and personal property, except jewelry belonging to my Wife and myself, be liquidated and proceeds there of [sic] be divided equally between my surviving immediate family members and those surving [sic] immediate family members of my Wife: JEROME B. HANNAN, KEVIN HANNAN, MICHAEL HANNAN, KATHLEEN HANNAN and DANIEL HANNAN, LYDIA ELIZABETH COVERT FRIEDMAN, PATRICIA JO COVERT TOLLEY, BARBARA

---

2. Zelinski has willingly relinquished any possible claim against the estate.

3. Decedent executed the Will on April 18, 1986. After signing it in front of two witnesses, Decedent handed it over to Zelinski's mother, Joan Covert, for safekeeping. The Will remained in her possession during the remainder of Decedent's life, and it was not located until after his death.

JANE COVERT, GENIA LOUISE COVERT, and KEL-
LEY ANN FRIEDMAN (said KELLEY is to share her
part with her sister KIMBERLY BETH FRIEDMAN).
*ITEM FIVE:* Jewelry belonging to myself shall be given to
my Wife if she survives me. If she has preceeded [sic] me
in death, it shall go to my brother DANIEL HANNAN, to
do with as he wishes. Jewelry belonging to my Wife, is
addressed in her own Will.

Both parties assume that the Decedent drafted the Will
himself, without the aid of legal counsel, although no evidence
was presented to confirm that conclusion.

Decedent's brother, Jerome B. Hannan ("Hannan") filed the
Will with the Register of Wills, and he was appointed personal
representative of the estate.[4] On May 16, 2007, the Orphans'
Court for Baltimore City concluded that "[t]he remaining
clause [in Item Four] pertaining to distribution provides that
certain family members, including [Friedman], are entitled to
distribution only if the Decedent died in a common disaster
with his wife[.]" Accordingly, the Orphans' Court ordered
that the Will not be admitted to probate, effectively leaving
Decedent intestate.

Both parties appealed to the Circuit Court, seeking an
interpretation of Item Four as a residuary clause and a
determination as to whether Zelinski's named family members
would inherit under that clause. At trial, Zelinski testified
that her named family members were her sisters and two of
her nieces. She admitted that Decedent did not know her
named family members prior to their marriage, and that those
family members did not live with them during the marriage.
Decedent's divorce attorney, Susan Huesman–Mitchell, testi-
fied that Decedent was a merchant marine, an avocation that
required him to live away from his wife on a boat for several
weeks at a time.

---

4. Jerome B. Hannan was appointed as personal representative of his
 brother's estate before the discovery of the Will. He remained in that
 capacity after the Will was found, despite Item Two's provision appoint-
 ing Kevin Hannan to that position.

The Circuit Court agreed with the parties' interpretation of Item Four as a residuary clause, and therefore found that Decedent died testate. The court then considered the Will as a whole and determined that its provisions relating to the immediate family of Decedent's wife could not be fulfilled because of the divorce. The court issued a written order, ordering that "only the immediate family members of the deceased ... receive the proceeds from the estate[,]" and that Friedman "be excluded from receiving any proceeds of the estate." The Court of Special Appeals affirmed in an unreported opinion, and Friedman filed a Petition for Writ of Certiorari to this Court. We granted certiorari to consider the following three questions:

1. Did the trial court err in deciding that the bequests to Friedman were conditioned on Decedent being married to Zelinski at the time of Decedent's death?

2. Did the trial court err in deciding that the bequests to Friedman were class gifts and not individual gifts even though the beneficiaries were individually named in the will?

3. Did the trial court err in deciding that ET Section 4–105(4) acts to revoke a person's testamentary gifts to his former spouse's specifically identified family members when his will was executed during his marriage and unchanged after his divorce?

We hold there was no error, and affirm the Circuit Court.

## STANDARD OF REVIEW

Pursuant to Maryland Rule 8–131(c), where, as here, an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. "It will not set aside the judgment of the trial court on the evidence unless clearly erroneous[.]" Md. Rule 8–131(c). "The appellate court must consider evidence produced at the trial in a light most favorable to the prevailing party[.]" *Ryan v. Thurston*, 276 Md. 390, 392, 347 A.2d 834, 835 (1975). "If there is any competent evidence to support the factual find-

ings below, those findings cannot be held to be clearly errone-ous." *Solomon v. Solomon,* 383 Md. 176, 202, 857 A.2d 1109, 1123 (2004) (citation omitted). The trial court's conclusions of law, however, are not entitled to the deference of the clearly erroneous standard. *See Clancy v. King,* 405 Md. 541, 554, 954 A.2d 1092, 1099 (2008).

## DISCUSSION

Neither party argues that the Will is invalid or should not be admitted to probate. Moreover, the parties agree that Item Four of the Will functions both as a simultaneous death clause and a residuary clause in the event that Decedent's wife predeceased him. The dispute is whether the bequest to Friedman in Item Four of the Will survived the divorce of Decedent and Zelinski.

Friedman contends that in Item Four Decedent crafted individual bequests with the intent that those gifts survive any divorce between Decedent and Zelinski. Hannan responds that the bequest to Friedman was contingent upon Decedent being married to Zelinski at the time of his death. Hannan views the bequest as one intended to be a gift to a class, which fails because of the divorce. They also differ on the meaning of ET Section 4–105, with Friedman arguing for a narrow interpretation, and Hannan urging the opposite.

The starting point of our analysis will be ET Section 4–105, which sets forth the methods or circumstances under which a will may be revoked. Subsection (4) thereof includes divorce as a cause of dissolution to this extent:

*Divorce or annulment.*—By an absolute divorce of a testa-tor and his spouse or the annulment of the marriage, either of which occurs subsequent to the execution of the testator's will; *and all provisions in the will relating to the spouse, and only those provisions,* shall be revoked unless other-wise provided in the will or decree.

(Emphasis added).[5] Both parties agree that the statute applies, and that the case turns on the meaning of "relating to the spouse[.]" Although neither party contends that this provision is ambiguous, they divide on its meaning. Hannan argues that the phrase "provisions in the will relating to the spouse" mandates revocation when, in the mind of the testator, the connection between the legatees and the ex-spouse is "substantial and logical" and that there is "no other basis for a connection[.]" Friedman, on the other hand, advances a narrow interpretation, which would apply only to bequests to or for the direct benefit of the spouse.

Maryland has consistently recognized these guiding principles of statutory interpretation:

In statutory interpretation, our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional, or part of the Rules. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions, and our analysis ends. If, however, the language is subject to more than one interpretation, or when the language is not clear when it is part of a larger statutory scheme, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, and statutory purpose, as well as the structure of the statute.

---

**5.** When first codified in 1957 as Section 351 of Article 93, the statute did not include divorce and annulment as part of its enumerated list of acceptable methods to revoke a will. *See* Md.Code (1957), Article 93, § 351. Effective June 1, 1964, however, the General Assembly enacted Chapter 106 of the Acts of 1964, which added a new Section 351(d), expanding that list to include absolute divorce. Although revised slightly since that time and recodified as ET § 4-105(4), the subsection has remained substantially unchanged (other than the addition of annulment as a catalyst for revocation) since 1964. *Compare* ET § 4-105(4) with Md.Code (1957), Article 93, § 351(d).

*People's Ins. Counsel Div. v. Allstate Ins. Co.,* 408 Md. 336, 351–52, 969 A.2d 971, 979–80 (2009) (quotation marks and citations omitted).

■ Following these principles, we start by considering the plain meaning of "relate," which is "[t]o stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with; with 'to.' " BLACK'S LAW DICTIONARY 1288 (6th ed. 1990); *see also Morales v. Trans World Airlines,* 504 U.S. 374, 383, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992) (using the Black's Law definition of "relate" to interpret the Airline Deregulation Act of 1978 which preempted States from enforcing any law "relating to rates, routes, or services" of any air carrier). Thus, the ordinary meaning of "relate" is the existence of a connection between two subjects, not that the two subjects need be the same. *See State v. Harrell,* 348 Md. 69, 81–82, 702 A.2d 723, 729 (1997) (stating that in order to qualify under the excited utterance exception to the hearsay rule, the "declarant's statement must have *some connection* with the startling event in order *to relate* to the startling event . . . .") (emphasis added); *Trimble v. BNSF Ry. Co.,* 636 F.Supp.2d 916, 922 (D.Neb.2009) (stating that the definition of "relating to" was not so narrow as to require that two subjects be identical); *Contractors Ass'n v. West Va. Dep't of Pub. Safety, Div. of Pub. Safety,* et. al., 189 W.Va. 685, 434 S.E.2d 357, 369 (1993) (services provided by Department of Public Safety for road patrol, traffic control, etc. were "relating to" the duties of the Division of Motor Vehicles because "the activities of one [agency] ha[d] a bearing on the activities of the other."). Courts have generally treated this language as broadly inclusive. *See Se. Ala. Med. Ctr. v. Sebelius,* 572 F.3d 912, 917 (D.C.Cir.2009) (holding that "fringe benefits—which are part of the compensation an employee receives for his or her services—fit comfortably within the broad meaning of the term 'wage-related.' ").

■ Like the courts in the cases cited above, we read "relating to" as a broad term, and hold that the trier of fact, when applying the statutory language of section 4–105(4) to

decide whether a particular bequest is one "relating to the spouse," is not limited to bequests to or for the benefit of the spouse. In other words, the trier of fact may determine that bequests to other persons nonetheless "relate to" the spouse. We draw this conclusion because the term "relating to" means that "there is a connection between two subjects, not that the subjects have to be the same." *Trimble,* 636 F.Supp.2d at 922. Fundamental principles of statutory construction require that we must take care to "ensure that no word, clause, sentence or phrase" is rendered surplusage by our interpretation. *People's Ins. Counsel Div.,* 408 Md. at 351–52, 969 A.2d 971. If the General Assembly had intended Section 4–105(4) to apply more narrowly, it had no reason to use the term "relating to." It could have simply said that upon divorce, "all provisions in the will for the former spouse are revoked." Its choice not to do this, but instead to use the broader "relating to" language, must be respected and enforced by this Court.

We are not persuaded by Friedman's argument that "[t]he deliberate inclusion of 'and only those provisions' is clear evidence that the legislature intended to limit the scope of [ET Section 4–105(4)] to revoke only those provisions relating to the former spouse." This language simply clarifies that the balance of the will remains intact. It adds nothing that would further define or limit the meaning of the phrase "relating to the spouse."

 With such a broadly worded statute, the task of determining, on a case by case basis, whether a particular bequest in a will was "related to" the decedent's former spouse, falls to the courts. This decision is made largely by the trial court because it involves a fact-based inquiry, i.e., determination of the decedent's intent. When construing a will, the "paramount concern of the court is to ascertain and effectuate the testator's expressed intent." *Pfeufer v. Cyphers,* 397 Md. 643, 649, 919 A.2d 641, 645 (2007) (quotation marks and citations omitted).

 Generally, that intent is "gathered from the four corners of the will, with the words of the will given their 'plain

meaning and import.'" *Id.* Where, as here, "a will is drawn by a layman, the language used may be given the meaning it would commonly have to a person in his situation[.]" *Shriner's Hosps. v. Maryland Nat'l Bank*, 270 Md. 564, 570, 312 A.2d 546, 550 (1973) (citations omitted). Ordinarily, extrinsic evidence is not admissible to prove the testator's intent unless there is a latent ambiguity. *See Monmonier v. Monmonier*, 258 Md. 387, 390, 266 A.2d 17, 19 (1970). Yet, when ascertaining that intent, the court may consider "the situation of the testator and his relations with the parties to whom he has devised or bequeathed his property[.]" *Robinson v. Mercantile Trust Co. of Baltimore*, 180 Md. 336, 339, 24 A.2d 299, 300 (1942). In that regard, the will must be "read in the light of the surrounding circumstances existing at the time of its execution." *Hebden v. Keim*, 196 Md. 45, 48, 75 A.2d 126, 128 (1950).

As the trial court in this case pronounced, "the duty to ascertain and effectuate a testator's intention is virtually ironclad." Adhering to that rule, the Circuit Court determined that Decedent intended to create two classes of legatees: (1) Decedent's surviving immediate family members, and (2) those surviving immediate family members of his wife. It concluded that because the bequest to his spouse's relatives was conditioned on him being married at his death, the bequest to the second class failed. Our task is to decide whether the Circuit Court's fact findings were clearly erroneous, or it made an error of law.

The Circuit Court's decision and Friedman's criticism of it can best be understood if we set forth the key portions in the language of the Court:

Looking at the will itself, taking the decedent's wife out of the will, it is clear that the testator intended to create two classes of persons to share equally in the proceeds of the estate.

The first class of individuals was the decedent's immediate family members, comprising of five persons. The second class, or group, consisted of six persons, namely his

wife's immediate family members. Persons 5 and 6; namely Kelly Ann Friedman, as well as Kelly Beth Friedman, Kelly was to share her part of the proceeds with her sister, Kimberly Beth Friedman.

The division here, looking at the four corners of this will, indicates an intent to create the two classes of persons as opposed to individual bequests.

At the time of his death, the decedent was unmarried. He did not have a wife. Since he did not have a wife, there were no immediate family members of a wife at the time of his death.

Absent any evidence to the contrary, this was a condition that the decedent—that decedent did not contemplate at the time that he signed the will.

The condition, namely passing of proceeds to his wife and/or her immediate family members, cannot be fulfilled.

I find that the case of *Herman v. Ortego,* 39 California App. 4th, 1529 to be particularly instructive in this case. In that case, which is extremely similar to the case at hand, the court indicated the decisive inquiry is whether or not the testator in making the particular gift in question did so with group mindiness.

Whether, in other words, he was looking at the body of persons in question as a whole or a unit, rather than individual members of the group as individuals, if the former they take as a class.

According to the holding in that case, the court found that we think it more logical construction to hold that when a testator provides for his spouses' children, he normally intends to exclude children of an ex-spouse after dissolution unless a contrary intention is indicated elsewhere in the will. We clearly do not have a contrary indication indicated elsewhere in the will.

And I also find that—that consistent with the out of state opinion, this testator clearly made a gift in terms of group mindiness. And I find that as evidence of six individuals on the immediate—six immediate family members on the wife's

side have to share in half the estate, but only five members of the decedent's immediate family have to share in this—the estate.

Friedman argues that the Circuit Court made an error of law in classifying the Item Four bequest as conditioned on Decedent remaining married to Zelinski at his death. In a related argument, Zelinski contends that "the court placed the burden on Petitioners to prove that Decedent actually intended what he unambiguously stated in his will rather than on Respondent to prove that he did not." As these two arguments are intertwined, we address them together.

The criteria for a class gift were stated in *Evans v. Safe Deposit & Trust Co.*, 190 Md. 332, 338, 58 A.2d 649, 652 (1948):

a gift of an aggregate sum (1) to a body of persons uncertain in number at the time of the gift, (2) to be ascertained at a future time, and (3) who are all to take in equal or some other definite proportions; the share of each being dependent for its amount upon the ultimate number of persons[.] (citations omitted).

*See also Madden v. Mercantile–Safe Deposit & Trust Co.*, 262 Md. 406, 278 A.2d 55 (1971). Friedman argues that the bequest necessarily fails the first criterion for a class gift because (1) there is no way to determine membership for this group without including the names, (2) the "number of persons was not uncertain when the will was drafted[,]" and (3) the "number of persons could not increase or decrease after the will was drafted." The legacy also fails the second element, she maintains, because "Decedent's gifts were to eleven people[,]" a number which was "known when the will was drafted and [was] not going to change."

We do not consider the traditional criteria for class gifts to be dispositive in this case.. These criteria are no more than an interpretive tool often used by courts when analyzing a will. As Maryland courts have held for more than a century, interpretive tools are ultimately subordinate to a court's paramount inquiry—the intention of the testator. *See, e.g., Evans,* 190 Md. at 341, 58 A.2d at 653 (canons of construction,

including those about class gifts, are subordinate to the general rule that the "obvious intent of the testator must prevail"); *Judik v. Travers*, 184 Md. 215, 221, 40 A.2d 306, 309 (1944) ("It is only when the verbal expressions are of doubtful meaning that the rules or canons of construction may be invoked, and even these rules have no binding force, being mere guides to aid in the discovery of this all important element of intention.").[6] More importantly, we must bear in mind that we are dealing with a statute, ET Section 4-105(4), which automatically operates to revoke certain bequests upon divorce, and the rules of will construction, such as class gifts, must be viewed in that context.

The trial court did not confine itself to the traditional "class gift" criteria to construe Decedent's intent. It focused on the divorce context, and found persuasive the rationale of a California case in which the court had to determine whether the testator intended to create two classes of devisees when he bequeathed his property to "my children and my spouse's children who survive me" and "my issue and my spouse's issue who survive me[,]" and whether those bequests remained valid

---

**6.** *See also, e.g., Johnson v. Swann*, 211 Md. 207, 212, 126 A.2d 603, 605 (1956) ("The answer depends upon the intention of the testator, as gathered from the will and surrounding circumstances, aided by recognized canons of construction."); *Grace v. Thompson*, 169 Md. 653, 658, 182 A. 573, 575 (1936)("These rules, naturally, have no binding or exclusive force, but are mere guides to aid in the discovery of what is, wherever the construction of a will is in issue, the supreme law of the case, the intention of the testator."); *Payne v. Payne*, 136 Md. 551, 555, 111 A. 81, 82 (1920) ("[O]f all the cardinal rules governing the interpretation of wills, ... the one to which all others are subordinate, is the rule that the intention of the testator, where that can be ascertained from the language of the will and from the circumstances surrounding the testator at the time of the execution, must control"); *Martin v. Cook*, 129 Md. 195, 199, 98 A. 489, 490 (1916) ("All rules ... are but aids for arriving at the intention of the testator...."); *Branson v. Hill*, 31 Md. 181, 188–89 (1869) ("It is then to the instrument itself to which we must at last resort in order to ascertain its true meaning, and if this can be done, reference to rules often arbitrary ... will be altogether unnecessary."); *Tayloe v. Mosher*, 29 Md. 443, 450 (1868) ("The intention is certainly, in every case, the object of ascertainment; but, wherever there is doubt and difficulty, the Courts must resort for aid to settled rules of construction.").

following a divorce. *See Hermon v. Urteago,* 39 Cal.App.4th 1525, 46 Cal.Rptr.2d 577, 579 (1995).

The California court held that the testator intended to create two groups of legatees because the words "my spouse's children" and "my spouse's issue" were used without naming any individuals, signaling the testator's paramount intent to describe the beneficiaries as members of a group identified by familial ties. *Id.* at 581. In so holding, the court stated:

> The decisive inquiry is whether or not the testator, in making the particular gift in question, did so with 'group-mindedness,' whether, in other words, he was looking to the body of persons in question as a whole or unit rather than to the individual members of the group as individuals; if the former, they take as a class.

*Id.* at 580.[7] This approach to ascertaining intent of the decedent is consistent with Maryland common law, and we do not agree with Friedman's contention that the Circuit Court erred when it utilized the approach in determining whether the bequest in Item Four was "related to" the Decedent's former spouse for purposes of ET Section 4–105(4).

As we indicated above, a court may consider the relationships between the testator and his beneficiaries when investigating intent. *See Robinson,* 180 Md. at 339, 24 A.2d at 300. Thus, the trial court did not err in considering the tenuous nature of Decedent's relationship to his spouse's family in

---

7. Other jurisdictions have also utilized the "groupmindedness" doctrine or similar rules. *See Rand v. Thweatt,* 222 Ark. 556, 261 S.W.2d 778, 779 (1953); *Krog v. Hafka,* 413 Ill. 290, 109 N.E.2d 213, 218 (1952); *Hardin v. Crow,* 310 Ky. 814, 222 S.W.2d 842, 844 (1949); *Sutherland v. Flaherty,* 1 Mass.App.Ct. 388, 298 N.E.2d 869, 871 (1973) ("In the construction of wills the test of the existence of a class is not whether the persons named form, in fact, a class by objective definition, but whether, subjectively, the testator considered them as such."); *In re Brown's Estate,* 324 Mich. 264, 36 N.W.2d 912, 913 (1949); *Estate of Frailey,* 625 S.W.2d 241, 243–44 (Mo.Ct.App.1981); *Jones v. Lewis,* 70 Ohio App. 17, 44 N.E.2d 735, 741 (1941) ("When there is a gift to a number of persons who are united or connected by some common tie, and it is clear that the testator was looking to the body as a whole … the gift may be construed as one given to them as a class.").

concluding that Decedent would not have intended that bequest to survive a divorce. In this vein, there was testimony before the court that indicated that Decedent did not know Zelinski's family members prior to marrying her, and that during a large portion of the marriage he was employed at sea.

We are not persuaded by Friedman's argument that the Circuit Court erroneously reversed the burden of proving that the gift to his wife's relatives was conditioned on the continuance of the marriage. We interpret ET Section 4–105(4) to be similar to a burden-shifting law. We conclude that in creating the automatic revocation of will provisions "relating to" a former spouse, the General Assembly recognized two pertinent features of divorce. First, divorce usually results in a separation of assets that were jointly owned, thus reducing each spouse's assets available to bequeath to his or her own family. Second, divorce is often acrimonious, with the acrimony spilling over to the former spouse's family. Also, it is common in writing wills during a marriage that two spouses divide their assets between their respective family members because they have agreed that is fair. Even without acrimony, this viewpoint is likely to change upon divorce. In enacting Section 4–105(4), the Legislature created a remedy to avoid unintended consequences for people who neglect to change their wills upon divorce.

For these reasons it is permissible for an Orphans' Court or circuit court to find that a will provision is "relating to" the former spouse within the meaning of Section 4–105(4) if it considers that the provision was primarily motivated by the marriage or given at the request of the spouse. As we mentioned above, a testator may provide for the children of a spouse simply because each spouse agrees to benefit the other's family, without any independent desire to devise property to those children.[8] On the other hand, a court could find

---

**8.** This principle might apply as well when a court is considering a bequest to nonrelatives, such as a "spouse's caretaker" or "spouse's church."

that a bequest did not "relate to" the spouse when the evidence shows that the testator formed a close personal relationship with the legatee and likely desired to provide for him or her regardless of whether the marriage continued.[9]

Decedent's naming of the individuals included in the bequest to his wife's relatives, in addition to referring to them by a group name, does not foreclose a finding that Decedent viewed them as a group of persons who would only inherit if he remained married. *See Cryder v. Garrison*, 387 Pa. 571, 128 A.2d 761, 764 (1957) (holding that a court may find a class gift where class members are individually named in the will when the testator intended to create a class gift). The Circuit Court in this case observed: "The division here, looking at the four corners of this will, indicates an intent to create the two classes of persons as opposed to individual bequests." Much of the evidence that the Circuit Court relied on to support the conclusion that Decedent made a bequest with "group-mindedness" is found in the text of Item Four itself. Although Decedent individually named each family member who would take pursuant to Item Four, he *first* identified those people according to their respective groups before listing their names. Additionally, Decedent placed the conjunction "and" before the last person comprising *each* group, thus suggesting an intent to create two lists, rather than one.[10] Finally, instead of specifically referring to Zelinski when classifying the Friedman group, Decedent described them as the "immediate family members of *my Wife*[.]" (emphasis added).

---

**9.** Friedman cites *Bloom v. Selfon*, 520 Pa. 519, 555 A.2d 75 (1989), *In re Estate of Kerr*, 520 N.W.2d 512 (Minn.App.1994), and *McGuire v. McGuire*, 275 Ark. 432, 631 S.W.2d 12 (1982). We have reviewed these cases, but they do not persuade us to reach a different result.

**10.** The names in Item Four are listed as follows: "JEROME B. HANNAN KEVIN HANNAN, MICHAEL HANNAN, KATHLEEN HANNAN *and* DANIEL HANNAN, LYDIA ELIZABETH COVERT FRIEDMAN, PATRICIA JO COVERT TOLLEY, BARBARA JANE COVERT, GENIA LOUISE COVERT, *and* KELLEY ANN FRIEDMAN (said KELLEY is to share her part with her sister KIMBERLY BETH FRIEDMAN)." (emphasis added).

Petitioner advances an argument based on a comparison of the Uniform Probate Code ("UPC") and ET Section 4–105(4) and purported legislative history. UPC Section 2–508, in effect in 1969, called for revocation of will provisions "to the spouse." At the same time, the precursor to Maryland's ET Section 4–105 contained largely the same language as the statute does today, in that it called for revocation of provisions "relating to the spouse." *See* Md.Code (1957), Article 93, § 351. In 1990, the UPC was amended to add a provision that the automatic revocation upon divorce also applied to any bequests "to a relative of the divorced individual's former spouse[.]" UPC § 2–804(b)(1) (1990) Petitioner posits that the

UPC did in its revision exactly what [Hannan] asks this Court to do—expand the concept of revocation beyond the former spouse to also include the former spouse's relatives. But Maryland has not adopted this portion of the UPC nor in any way indicated that it wished to expand this statute in such a manner.

In an effort to support her contention that the failure of the Maryland General Assembly to adopt the revised UPC Section 2–804(b)(1) demonstrates it had no intent that Section 4–105(4) would operate to revoke bequests to a former spouse's relatives, she invokes the Second Report of the Governor's Commission to Review and Revise the Testamentary Law of Maryland (the "Henderson Commission") which was issued in 1968.[11] She relies on the Commission's Comment to what was then Section 351 (now Section 4–105) which reads as follows:

This section adopts, without change or substance, § 351(Md) which was recently reconsidered and amended by the General Assembly. See the Comment to Section 3–301. The Commission therefore felt that the approach to the subject of 2–506 and 2–507(UPC), which is somewhat more restricted than the present Maryland law, should not be followed.

---

11. The Henderson Commission was chaired by Hon. William L. Henderson and was created to "Review and Revise the Testamentary Law of Maryland."

Friedman maintains, "This comment is not only evidence of an awareness of the UPC, but a willingness to vary from its proposed language." We have no doubt that the Henderson Commission was aware of the UPC, or that it considered itself free of any duty to recommend the UPC provisions to the General Assembly. But we do not agree that the Comment sheds light on the question at hand. In using the phrase "somewhat more restricted," the Comment refers to UPC Sections 2–506 and 2–507, neither of which addresses revocation by divorce.[12] Moreover, we see nothing in that Report that reveals a legislative intent that the words "relating to the spouse" in Section 4–105 should be construed narrowly.

## CONCLUSION

■ In sum, we hold that ET Section 4–105(4) is not limited in its effect to provisions for the direct benefit of the spouse. The decision as to whether a particular provision is one "relating to" a former spouse is a factual one to be made by the trial court. In doing so, a court should decide whether the testator in creating the provision was primarily motivated by the marriage or whether the testator had independent reasons for the bequest. In making that decision, the court may infer that bequests made to a former spouse's family were made primarily because of the marriage unless there is evidence of some independent reason in the will itself or the circumstances existing at the time of execution. For the reasons set forth above, we conclude that the Circuit Court did not err in finding that Decedent was "group-minded" in the Item Four residuary bequest, and that the bequest to Friedman failed as a result of the divorce.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

---

**12.** UPC Section 2–506 is titled "Choice of Law as to Execution," and Section 2–507 is titled "Revocation by Writing or by Act." These titles aptly describe the subject addressed in these sections.