57 A.3d 444

**STATE of Maryland**

v.

**John Wesley RAY.**

**No. 23, Sept. Term, 2012.**

Court of Appeals of Maryland.

Dec. 18, 2012.

**568**

---

James E. Williams, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for petitioner.

David P. Kennedy, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, McDONALD, JJ.

ADKINS, J.

John Wesley Ray has spent the last eleven years at Clifton T. Perkins Hospital, waiting to become competent to stand trial for a crime he allegedly committed in 2001. In 2009 the charges against him were dismissed pursuant to Section 3–107(a) of the Criminal Procedure Article ("CP") of the Maryland Code (2001, 2008 Repl.Vol.), which requires dismissal of charges upon passage of certain time periods. Shortly after the dismissal, however, the State re-indicted Ray, who once again was found incompetent and dangerous and placed at Perkins for another round of incompetency-to-stand-trial ("IST") treatment.[1] Ray challenges his re-indictment, arguing that the State should not be allowed to "continue to confine" him "by simply re-indicting [him] on the same charges that were required to be dismissed pursuant to § 3–107."

While we appreciate Ray's indignation, his arguments are misdirected. He conflates re-institution of charges with commitment, suggesting that the State impermissibly confined him because of the re-indictment. But indictment is just one of several prerequisites to IST commitment. Under the Maryland incompetency statutes, IST commitment is appropriate only when the defendant is facing criminal charges, is incom-

---

1. In Maryland, a person who is declared "incompetent to stand trial" is unable to (1) understand the nature or object of the proceeding or (2) assist in her defense. Md.Code (2001, 2008 Repl.Vol., 2012 Cum. Supp.), § 3–101 of Criminal Procedure ("CP") Article. Although parties refer to commitment under CP § 3–106(b) as "criminal commitment," incompetent-to-stand-trial ("IST") commitment is a more accurate term. When a defendant is confined under CP § 3–106(b), the purpose of the confinement is to make the defendant competent to stand trial. *See* Justice Policy Institute, *When Treatment Is Punishment: The Effects of Maryland's Incompetency to Stand Trial Policies and Practices* 7 (Oct.2011). Mere pendency of criminal charges no longer results in such commitment. As we discuss below, this type of commitment is appropriate only so long as there is a substantial likelihood that the defendant will become competent in the foreseeable future. *See* CP § 3–106(b) & (d). Accordingly, the term "IST commitment" is more accurate than the term "criminal commitment."

petent, dangerous, and substantially likely to become competent in the foreseeable future. Unfortunately, when the circuit court placed Ray in IST commitment, it made no finding as to whether Ray was likely to become competent, *i.e.* whether he was "restorable."[2] It is the lack of such a finding—but not the re-indictment itself—that should have been the focus of Ray's challenge.

Ray's argument challenging re-indictment is not only misdirected; it also has no support in the statutes. CP § 3–107 expressly provides that a dismissal of charges is without prejudice, and nothing in the legislative history suggests that the General Assembly intended to place a limit on the State's power to re-indict after a CP § 3–107 dismissal. Thus, we hold that the State may re-indict a defendant after a CP § 3–107 dismissal without establishing his competency.

This does not mean, however, that the re-indictment resets the clock for constitutionally-permissible IST commitments. The dismissal deadlines under CP § 3–107 provide yardsticks for determining the reasonable amount of time necessary to determine if a defendant is restorable. Once these statutorily-prescribed time periods expire and charges are dismissed, there is a presumption that the time necessary for determining whether an individual is restorable has passed. To then place a re-indicted defendant in IST commitment without overcoming the presumption that he was unrestorable would contradict the legislative intent behind the recent amendments to our incompetency statutes. Accordingly, the error below was not that the circuit court allowed the State to re-indict Ray after a CP § 3–107 dismissal, but that it placed him in IST commitment, when there was a presumption that he was unrestorable. We give the circuit court an opportunity to correct this error on remand.

---

**2.** The term "restorable" is a shorthand for describing situations when there is a "a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future." *See* CP § 3–106(b)(1)(iii).

## FACTS AND PROCEDURAL HISTORY

Many pages of appellate reports have been devoted to Ray's mental disease and his psychotic delusions. *See Ray v. State,* 410 Md. 384, 978 A.2d 736 (2009) (*"Ray I "*); *Adams v. State,*[3] 204 Md.App. 418, 41 A.3d 572 (2012) (*"Ray II "*). It suffices to say that Ray is a diagnosed paranoid schizophrenic with violent thoughts toward others and delusions about his involvement with law enforcement. *Ray I,* 410 Md. at 390, 393, 395, 978 A.2d at 739–40, 742.

### The Initial Charges and IST Commitment

In 2001, Ray was charged with first-degree attempted murder and lesser included offenses in connection with an alleged attack on his former girlfriend. *Id.* at 387, 978 A.2d at 737. Ray entered a plea of not criminally responsible and was found incompetent to stand trial in 2002. He was committed to the Department of Health and Mental Hygiene ("DHMH") and placed at Clifton T. Perkins Hospital in Jessup, Maryland. *Id.*

Until 2004, Ray did not want to take medications because he believed they impeded his "psychic powers." *Id.* at 394, 396, 978 A.2d at 741, 742. Later, he was back on medication with varying success. For instance, in the opinion of one of his doctors in 2007, Ray responded to treatment with Rispiridon "enough to not be a danger to others while in the hospital" but not enough to truly understand "that he has a mental illness." *Id.* at 396, 978 A.2d at 742.

During the initial five years at Perkins, there was a time when Ray's doctors believed he may have become competent. In 2005, he was referred to a pretrial criminal responsibility evaluation, but it revealed that the doctors were wrong. Ray continued to be delusional and, as a result, incompetent to stand trial. *Id.* at 390, 978 A.2d at 739. Other than this incident of mistaken competence, Ray's annual competency

---

3. For argument and briefing before the Court of Special Appeals Ray's case was consolidated with the appeal of Michael Lee Adams.

evaluations consistently declared him incompetent to stand trial. *Id.* at 389, 978 A.2d at 738.

### Ray's First Motion to Dismiss Charges

In 2007, Ray filed a motion to dismiss charges under CP § 3–107, arguing that a dismissal was proper because five years had gone by without his restoration to competency. *Id.* The State opposed the motion. It contended that because Ray was incompetent and dangerous, but restorable, there was an "extraordinary cause" allowing the charges to stand. *Id.*

Four psychiatrists testified at a hearing on Ray's motion. The Director of Pretrial Services at Perkins, a supervisor of incompetent patients at Perkins, and a fellow in forensic psychiatry at Perkins all testified in general terms that they believed Ray was restorable because he was partially responding to his current medications and that "he certainly has not had an exhaustive trial of all the available antipsychotic medications." *Id.* at 389–94, 978 A.2d at 739–41. Ray's treating psychiatrist was more specific. He indicated that, despite Ray's partial improvement, "he was too delusional in the sense he was still having fixed false ideas of multiple situations that were also described in his admission." *Id.* at 394, 978 A.2d at 742. Nevertheless, Ray's treating psychiatrist also believed Ray could be restored to competency with proper medication, such as Clozapene.[4] *Id.* at 396, 978 A.2d at 743. At the conclusion of the hearing, the Circuit Court for Harford County found "extraordinary" cause to extend the time to maintain Ray's criminal charges and denied Ray's motion to dismiss. *Id.* at 402, 978 A.2d at 746.

### The First Appeal: Ray I

Ray appealed the Circuit Court's ruling. Prior to any proceedings in the Court of Special Appeals, we granted certiorari. *Id.* at 388, 978 A.2d at 738. The issue before us

---

4. Specifically, the doctor believed that Ray had a "90 percent or more chance of being competent on Clozapene" but noted that Ray had not begun taking that medication because his guardian's consent was necessary. *Ray v. State*, 410 Md. 384, 396, 978 A.2d 736, 743 (2009) ("Ray I").

was "whether 'extraordinary cause' existed to extend the time for Ray's criminal charges or whether the charges should have been dismissed, because five years had elapsed since Ray was found not competent to stand trial." *Id.* at 405–06, 978 A.2d at 748. We held that there was no "extraordinary cause" to extend the statutorily-prescribed time[5] and directed the Circuit Court to dismiss Ray's charges. *Id.* at 419–20, 978 A.2d at 756–57. We noted, however, "that under the statute the State may re-institute charges and that civil commitment proceedings may be initiated against Ray." *Id.* at 420, 978 A.2d at 757.

### The Re–Institution of Charges and Ray's Second Motion to Dismiss

The State took our recognition that charges may be re-filed as an invitation to immediately re-charge Ray.[6] He filed a motion to dismiss the new charges, arguing that the State's re-institution of charges nullifies CP § 3–107(a) and denies him "any of the statutory remedies and civil commitment process provided in [CP §] 3–106(a) through (e)." While his motion was pending, Ray alleged incompetency to stand trial. In accordance with CP § 3–101(f), the Circuit Court for Harford County ordered a competency examination. The order required the DHMH to examine Ray and "determine whether [he] is able to understand the nature or object of the proceeding or to assist in his defense" and whether he "would be a danger to himself or the person or property of another if released."

---

5. In so holding, we reasoned that "extraordinary cause" must mean more than dangerousness and restorability. After all, dangerousness is "the norm for defendants institutionalized at Perkins," and if restorability, which is "a desirable characteristic," amounted to "extraordinary cause," it "could result in indefinite institutionalization, without procedural protection." *Id.* at 419–20, 978 A.2d at 756–57.

6. Our opinion in Ray I, requiring that Ray's charges be dismissed, was filed on August 27, 2009. The State indicted Ray on the same charges in the Circuit Court for Harford County on October 7, 2009. The original charges were dismissed without prejudice on November 3, 2009.

The examination confirmed that Ray's mental illness is not malingered and that he was both incompetent and dangerous. The competency evaluation report, dated January 28, 2010, revealed that, since the last examination in 2007, Ray had been treated with Clozapene, and that at that time he was taking Abilify, Depakote, Ecotrin, and Niacin. The report also stated that during Ray's stay at Perkins, he had been treated with other antipsychotic medications, including Seroquel, Risperdal, and Geodon. Although these medications brought some "improvement in [Ray's] symptoms," according to the psychiatrist, "there was never complete resolution."

The psychiatrist noted that although "Ray has an advanced understanding of courtroom proceedings and terminology" and "agreed that he has Schizophrenia," he "continued to talk about details of the case in a delusional manner." The psychiatrist concluded: "It was apparent that Ray has no actual insight [into his illness]. He continues to think that his delusions are reality.... These delusions make him unable to assist in his defense. Therefore, to a reasonable degree of medical certainty, Ray is not competent to stand trial." Additionally, because of the persistent psychotic delusions and "a history of dangerous behaviors in response to his delusions," the psychiatrist considered Ray dangerous and recommended that he "be maintained within a hospital setting." The report did not say anything about whether Ray could still be considered restorable.

Based on the report and following a hearing, on March 1, 2010, the Circuit Court found Ray dangerous and incompetent and ordered that he be placed in IST commitment in accordance with CP § 3–106(b). Thereafter,[7] on March 31, 2010, the Circuit Court denied Ray's motion to dismiss the new charges.[8]

---

7. The hearing on Ray's motion to dismiss charges was held on January 11, 2010, prior to the issuance of the competency evaluation.

8. The Circuit Court gave three reasons for its ruling. First, the court emphasized that the dismissal of criminal charges against an incompe-

## The Second Appeal: Ray II

Ray appealed the Circuit Court's denial of his motion to dismiss,[9] and the Court of Special Appeals reversed the Circuit Court's ruling. *Ray II*, 204 Md.App. at 439, 41 A.3d at 584. The intermediate appellate court read CP § 3–107 as "establish[ing] the maximum period that an indictment may remain pending against an untried but incompetent defendant." *Id.* at 435, 41 A.3d at 582. Although the court acknowledged that "the General Assembly contemplated that, at one point in time, the State could decide to re-indict after [a CP § 3–107(a)] dismissal," it held that the State may not do so "until it can articulate a good faith basis to believe that the defendant has become competent to stand trial." *Id.* at 436, 437, 41 A.3d at 582, 583.

■ The State filed a petition for certiorari, which we granted.[10] *See State v. Ray*, 426 Md. 427, 44 A.3d 421 (2012). The State presents the following question for our review:

Given that this Court held in *Ray v. State*, 410 Md. 384 [978 A.2d 736] (2009), that the State may re-institute crimi-

---

tent defendant after five years is "without prejudice." Second, the court was "uncertain how the current indictment precludes the Defendant from again averring that he is incompetent to stand trial and thereby availing himself of possible civil commitment pursuant to CP § 3–106(b)." The court concluded: "the current indictment does not prevent the Defendant from being committed to a mental health institution pursuant to CP § 3–106 after a trial judge has made the necessary findings of fact." Third, finding no support either in the Criminal Procedure Article or case law, the Circuit Court rejected Ray's "argument that re-indictment without first determining his competence to stand trial is improper."

9. Although before the Court of Special Appeals Ray's case was consolidated with Adams' case, there is at least one significant difference between the two cases. Unlike in Ray's case, in Adams' case, the Assistant State's Attorney conceded in the circuit court proceedings that "it's very unlikely that [Adams] would ever been [sic] found competent," and the psychiatrist noted that "there are some organic difficulties that [Adams] has that may make it impossible" for him to ever become competent.

10. The State did not appeal the dismissal of charges against Michael Adams.

nal charges against defendants who succeeded in having those charges dismissed under Section 3–107 of the Criminal Procedure Article, did the Court of Special Appeals err in reversing the lower court's proper denial of Ray's motions to dismiss those re-instituted charges?

## STANDARD OF REVIEW

The answer to the State's question requires an examination of the Maryland incompetency statutes. As we have observed many times, "the paramount goal of statutory interpretation is to identify and effectuate the legislative intent underlying the statute(s) at issue." *Derry v. State*, 358 Md. 325, 335, 748 A.2d 478, 483 (2000). We always begin "our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Friedman v. Hannan*, 412 Md. 328, 337, 987 A.2d 60, 65–66 (2010) (quoting *People's Ins. Counsel Div. v. Allstate Ins. Co.*, 408 Md. 336, 351–52, 969 A.2d 971, 979–80 (2009)).

We need look no further than the statutory text "[i]f the language of the statute is clear and unambiguous." *Id.*, 987 A.2d at 66 (quoting same). But if "the language is subject to more than one interpretation, or when the language is not clear when it is part of a larger statutory scheme," we try "to resolve that ambiguity by looking to the statute's legislative history, case law, and statutory purpose, as well as the structure of the statute." *Id.* (quoting same). In this endeavor, our goal is to "discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision." *Id.*, 987 A.2d at 65 (quoting same).

## DISCUSSION

The issue before us is whether the State may re-indict a defendant after his charges were dismissed under CP § 3–107 without some showing that the defendant has regained competency. To answer this question, we first turn to the plain language of the Maryland incompetency statutes. We also

review the historical background and the legislative history of the most recent amendments to our incompetency laws. We see nothing suggesting that the General Assembly intended to limit the State's power to re-indict.

The plain language of the 2006 amendments and their legislative history show that the General Assembly's main concern was putting an end to indefinite IST commitments, which it sought to do by requiring periodic judicial reviews of restorability and prohibiting IST commitments of unrestorable defendants. The dismissal deadlines of CP § 3–107 further helped ensure that the State does not confine an incompetent defendant in IST commitment longer than is necessary to determine whether such a defendant is restorable. These changes impact the IST commitment procedures but do not affect the State's ability to re-indict.

### The Plain Language of CP § 3–107

The Maryland incompetency statutes do not directly address re-indictment of defendants after their charges were dismissed under CP § 3–107. The parties hinge their arguments for and against the re-institution of charges on two provisions in CP § 3–107. Ray focuses on the mandatory dismissal language of CP § 3–107(a), which requires a "[d]ismissal of charges for certain crimes after certain time." He argues "that five years is an almost absolute upper bound on the power of the State to hold a pre-trial detainee under the status of incompetent to stand trial, even if he is dangerous and restorable." In Ray's opinion, the State should not be allowed to circumvent this upper limit by re-instituting the charges against an incompetent defendant.

Central to the State's argument is another paragraph in CP § 3–107, namely, the requirement in CP § 3–107(b) that charges be dismissed "without prejudice." The State relies on this provision to conclude that "[n]othing in the statutory scheme of CP § 3–107 precludes re-instituting charges after dismissal for a dangerous restorable [11] criminal defendant."

---

11. As we explained above, no restorability finding was made in this case.

(Footnote added). Quite the opposite, the State argues, "the statutory scheme condones reinstitution of charges against a defendant of this quality by expressly setting forth that dismissal under that section is without prejudice."

The Court of Special Appeals adopted Ray's position. It was of the opinion that the "dismissal deadlines in section 3–107(a) provide yardsticks for measuring 'the reasonable period of time necessary to determine whether [a defendant is restorable].' " *Ray II*, 204 Md.App. at 435–36, 41 A.3d at 582. This led the intermediate appellate court to conclude that "the State may not re-indict after a section 3–107(a) dismissal until it can articulate a good faith basis to believe that the defendant has become competent to stand trial." *Id.* at 437, 41 A.3d at 583. The court was concerned that "[o]therwise, the only purpose that can be served by re-indictment is the constitutionally impermissible purpose of continuing the defendant's confinement under a criminal commitment." *Id.*

Ray and the intermediate appellate court treat re-indictment and commitment as the same. We have a different view of this. Although one must be indicted in order to be considered for IST commitment, one is not subject to IST commitment just because of the indictment. *See* CP § 3–106(b)–(d). As we discuss in detail below, in addition to being charged with a crime, there are three other prerequisites to IST commitment: (1) incompetence to stand trial, (2) dangerousness, and (3) restorability. *See* CP § 3–106(b). Accordingly, a defendant who is incompetent and dangerous but non-restorable would not be subject to IST commitment.[12] *See id.*

---

12. Such a defendant may be subject to civil commitment under CP § 3–106(d)(1). Civil commitment is proper so long as there is "clear and convincing evidence" that,
> (i) the defendant has a mental disorder;
> (ii) inpatient care is necessary for the defendant;
> (iii) the defendant presents a danger to the life or safety of self or others;
> (iv) the defendant is unable or unwilling to be voluntarily committed to a medical facility; and
> (v) there is no less restrictive form of intervention that is consistent with the welfare and safety of the defendant.

Neither would a defendant who is incompetent and restorable but not dangerous. *See id.*

While Ray reads too much into the dismissal deadlines of CP § 3–107(a), the State oversimplifies the issue by focusing only on the "without prejudice" provision of CP § 3–107(b). As a result, the only thing that these conflicting accounts do well is illustrate that, although CP § 3–107 is unequivocal on the issue of the dismissal of charges, it leaves open to debate the issue of when the State may re-indict a defendant following a CP § 3–107 dismissal. In search of an answer to this question, we turn to the legislative history of our incompetency statutes.[13]

### The Maryland Incompetency Laws

The Maryland incompetency statutes set forth a process through which a defendant charged with a crime may allege (1) incompetence to stand trial, (2) be adjudicated incompetent, and (3) depending on whether she is dangerous and likely to become competent in the foreseeable future, be released, become subject to incompetence commitment, or become civilly committed. These statutes have undergone several changes since their inception. An appreciation for these transformations aids in understanding the legislative intent behind the most recent amendments.

*An Indefinite Commitment and Discretionary Dismissal*

Prior to 1967, Maryland had no mechanism for terminating IST commitment of individuals who were not likely to ever

---

An individual who is both dangerous and incompetent will undoubtedly meet the requirements for civil commitment.

**13.** We visited the legislative history of CP § 3–107 in Ray I. There, our task was to determine whether Ray's dangerousness, incompetence, and restorability constituted the "extraordinary cause" under CP § 3–107, which would allow his charges to be extended beyond the statutorily-prescribed limits. *Ray I,* 410 Md. at 405–06, 978 A.2d at 748. Here, the focus of our inquiry is different. Our concern now is what the General Assembly sought to accomplish when it required dismissal of charges without prejudice and what effect—if any—the "without prejudice" provision has on the subsequent re-institution of charges.

become competent. *See, e.g.,* Md.Code (1951), Article 59, § 8. Once a defendant was found incompetent to stand trial, he was to be confined in a mental institution "until he or she shall have recovered," at which time "the court shall proceed with the trial of the charge pending against such person." *Id.* At that time, there was also no requirement of periodic incompetence review by the court. *Id.*

In 1967, the General Assembly repealed and re-enacted this statute to give courts discretion to dismiss charges against an incompetent defendant upon expiration of certain time periods. Namely, after the 1967 amendments, courts could dismiss charges if "so much time has elapsed since the finding of incompetency that it would be unjust to resume the criminal proceedings." Chapter 709, § 8(b) of the Acts of 1967 (codified at Md.Code (1957, 1964 Repl. Vol., 1967 Cum.Supp.), Article 59, § 8(b)). Still, unless a court exercised discretion, an incompetent defendant could be confined in a mental institution indefinitely. *See id.* at § 8(a).

The discretionary dismissal language of Section 8(b) remained substantially the same until 1982, when the statute was amended and re-codified as Section 12–105 of Health–General ("HG") Article.[14] Section 8(a) was also repealed and re-codified in the Health–General Article. It continued to provide that an incompetent and dangerous defendant be confined "until the court is satisfied that the defendant no longer is incompetent to stand trial or no longer is, because of mental retardation or a mental disorder, a danger to the

---

14. At that time, it read as follows:

 Whether or not the defendant is confined, if the court considers that resuming the criminal proceeding would be unjust because so much time has passed since the defendant was found incompetent to stand trial, the court may dismiss the charge. However, the court may not dismiss a charge:
 (1) Until 10 years after the defendant was found incompetent to stand trial in any capital case; or
 2) Until 5 years after the defendant was found incompetent to stand trial in any other case where the penalty may be imprisonment in the State Penitentiary.
 Md.Code (1982), § 12–105 of the Health—General Article ("HG").

defendant or the person or property of another."[15] HG § 12–104(b).

In 2001, the General Assembly revisited the incompetency statutes again. It repealed HG § 12–104 and § 12–105 and re-enacted these statutes, without changes, as CP § 3–106 and § 3–107 respectively. Accordingly, as of 2001, dismissal of charges against incompetent defendants in Maryland was discretionary upon expiration of certain time periods and, absent the exercise of discretion or the defendant's becoming competent, an IST commitment could still continue indefinitely. *See* CP § 3–107 (2001).

### The 2006 Amendments

In August of 2004, Maryland Disability Law Center ("MDLC") filed a complaint in the Circuit Court for Baltimore City, challenging the Maryland incompetency statutes as unconstitutional. *See* Complaint, *Swann v. State,* No. 24C04006483 (Md.Cir.Ct. Aug. 24, 2004). MDLC argued that the statutes ran contrary to the United States Supreme Court's holding in *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) because they allowed for "indefinite continued commitment for treatment to restore competency to stand trial regardless of whether [an incompetent defendant] may soon be so restored." Mem. Law Supp. Pls.' Compl. Decl. J. & Pls.' Mot. Prelim. Decl. Relief at 2, No. 24C04006483. MDLC argued that Maryland must follow *Jackson* and require "that the nature and duration of confinement bear some reasonable relation to its purpose."[16] *Id.* at 15.

---

**15.** It further permitted the court to "reconsider whether the defendant is incompetent to stand trial" upon the defendant's motion or its own initiative. HG § 12–104(c).

**16.** Thus, MDLC urged the Circuit Court, among other things, (1) to require periodic reviews of the probability that the defendant would become competent in the foreseeable future and (2) release or refer for civil commitment incompetent defendants who are not restorable. Mem. Law Supp. Pls.' Compl. Decl. J. & Pls.' Mot. Prelim. Decl. Relief at 17, No. 24C04006483 (Md.Cir.Ct.2004).

MDLC's suit came to the attention of the General Assembly.[17] *See* Dep't of Legis. Servs. Fiscal & Pol'y Note on HB 795, at 6 (2006). In the summer of 2005, a workgroup convened to examine the incompetency laws that existed at the time. S. Judicial Proceedings Comm., Floor Rep. on HB 795, at 7 (2006). The workgroup was attended by Delegate Kathleen M. Dumais and Senator Brian E. Frosh and included representatives of MDLC, the courts, the Office of the Public Defender, the State's Attorney's Office, the Department of Health and Mental Hygiene, the Office of the Attorney General, Maryland Crime Victims Resource Center, and other interested groups and individuals. *Id.*

As a "result of long discussion and compromise" among the members of the workgroup, House Bill 795 came to life. State of Md. Office of the Pub. Defender, Position on Proposed Legis.: HB 795 (Feb. 22, 2006). On February 8, 2006, Delegate Dumais introduced the bill, which was assigned to the House Judiciary Committee. The Committee held a hearing where it accepted oral and written testimony in support of and against the bill.[18]

Between the first and the third reading, HB 795 underwent several alterations, including, significant for this appeal,[19] the change from the requirement that charges against incompetent defendants be dismissed "with prejudice" to "without prejudice." The predecessor statute, which gave discretion to the courts to dismiss charges upon expiration of certain time periods, did not specify whether such dismissals were to be with or without prejudice. *See* CP § 3–107 (2001). But the original version of HB 795 changed the discretionary language

---

**17.** The suit was ultimately dismissed without prejudice.

**18.** Among the groups that offered written testimony in favor of the bill were the Office of the Public Defender, MDLC, the Department of Health and Mental Hygiene, Mental Health Association of Maryland, Inc., and Maryland Department of Disabilities. A crime victim and the Maryland Crime Victims' Resource Center, Inc., testified against the bill.

**19.** There were two other amendments that are not relevant here.

to mandatory and added the "with prejudice provision." Without elaboration on the record,[20] the House Judiciary Committee issued a favorable report with an amendment to substitute "with" for "without" prejudice. This proposed amendment was adopted when the bill was read for the second time on March 7, 2006, and became part of the final version of the bill signed into law.

The enactment of HB 795 brought comprehensive changes to Title 3 of the Criminal Procedure Article, as it substantially revised CP §§ 3–104 through 3–108 and 3–123. Chapter 353 of the Acts of 2006. The amendments relevant here are the changes to CP § 3–106 and CP § 3–107. CP § 3–106(b) was amended to provide that IST commitment was only appropriate so long as a defendant is incompetent, dangerous, and there was "a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future." Specifically, CP § 3–106(b) now provides that if "the court finds that the defendant is incompetent to stand trial and, because of mental retardation or a mental disorder, is a danger to self or the person or property of another, the court may order the defendant committed to the facility that the Health Department designates," but this commitment may only continue "until the court finds that: (i) the defendant no longer is incompetent to stand trial; (ii) the defendant no longer is . . . a danger to self or the person of property of others; or (iii) there is not a substantial likelihood that the

---

**20.** The legislative history is silent on the reasons for this change. The only reference to the original "with prejudice" provision is found in the written testimony of an opponent of the bill, the Maryland Crime Victims' Resource Center, Inc., which maintained that a mandatory dismissal without prejudice "is contrary to the public interest." Maryland Crime Victims' Resource Center, Inc., Testimony of Roberta Roper & Russell P. Butler, Esq., to the S. Judicial Proceedings Comm. and H. Judicial Comm. in Opposition to SB 807 & HB 795 (Feb. 22, 2006). Specifically, the Maryland Crime Victims Resource Center argued that "[e]xisting law is adequate regarding dismissal of charges against a defendant who is found incompetent to stand trial. There is no need to adopt such an extreme proposal which would allow for dismissal of criminal charges as early as the date upon which a person is found incompetent to stand trial and subsequently provide for a mandatory dismissal with prejudice." *Id.*

defendant will become competent to stand trial in the foreseeable future."

CP § 3–106(c) was also re-written to require courts to reconsider a defendant's suitability for IST commitment, *i.e.* that the defendant is incompetent, dangerous, and restorable, every year from the date of commitment, within 30 days after the filing of a motion by a party, or after receiving a report from the Health Department presenting new findings. If this examination reveals "that the defendant is incompetent and is not likely to become competent in the foreseeable future," the IST commitment must end.[21] *See* CP § 3–106(d).

HB 795 also re-wrote CP § 3–107. It added a paragraph that mandates dismissal of charges upon expiration of requisite time periods. Namely, dismissal of charges is now required in a capital offense case involving an incompetent defendant after the expiration of ten years; "a felony or a crime of violence as defined under § 14–101 of the Criminal Law Article, after the lesser of the expiration of 5 years or the maximum sentence for the most serious offense charged," and other offences after three years. CP § 3–107(a).

HB 795 maintained the language that was present in the statute since 1967 in paragraph (b) but changed it from discretionary to mandatory and added that a dismissal be "without prejudice": "Whether or not the defendant is confined, if the court considers that resuming the criminal proceedings would be unjust because so much time has passed since the defendant was found incompetent to stand trial, the court shall dismiss the charge without prejudice." CP § 3–107(b).

---

21. This does not mean, however, that an incompetent, unrestorable, and potentially dangerous defendant is released into the general public. If certain criteria are met, "the court shall ... civilly commit the defendant as an inpatient in a medical facility that the Health Department designates." CP § 3–106(d)(1). Alternatively, "the court shall ... order the confinement of the defendant for 21 days as a resident in a Developmental Disabilities Administration facility for the initiation of admission proceedings under § 7–503 of the Health–General Article provided the court finds that the defendant, because of mental retardation, is a danger to self or others." CP § 3–106(d)(2).

## Re–Indictment After a CP § 3–107 Dismissal

The parties draw different inferences from these statutory changes. The State argues that "the re-institution of charges initially dismissed under CP § 3–107 is supported by the fact that the legislature specifically stated that dismissal under CP § 3–107 is 'without prejudice.'" Not surprisingly, Ray disagrees. He argues that the State's act of "re-indicting immediately after the mandatory dismissal ... is inconsistent with the purpose of § 3–107 in light of the constitutional requirements of *Jackson*." Ray emphasizes that "[u]nder *Jackson*, the State may not hold an incompetent detainee longer than the time necessary to determine if there is a substantial probability that he will become competent in the foreseeable future." Thus, Ray concludes: "if the State seeks to continue to hold such a detainee beyond the manifestly unreasonably long period of five years, it should bear the burden of justifying its decision with proof of a then-present probability of restorability in the near future."

We agree with Ray that, in order **"to hold"** a detainee after a CP § 3–107 dismissal, the State must show that the detainee is restorable. But **holding** a detainee is not the same as merely **charging** him. It is true that under CP § 3–106 to be "held" in IST commitment a defendant must be restorable, but we see nothing in our incompetency statutes that would require the State to make a restorability showing when it re-indicts a defendant. The legislative history supports this view: it was the lack of a rational relationship between IST commitments and restorability and the resulting indefinite IST commitments under the predecessor statute that fueled the 2006 amendments, not any pending criminal charges. This is evident from the General Assembly's awareness of the Supreme Court's holding in *Jackson v. Indiana*, the legislators' statements regarding what they hoped the 2006 amendments would accomplish, and the amendments themselves.

### The Significance of Jackson v. Indiana

The Supreme Court's holding and reasoning in *Jackson v. Indiana* was the foundation of the MDLC lawsuit that trig-

gered the 2006 amendments. In *Jackson,* the Court held that an indefinite IST commitment of an incompetent defendant— who is unlikely to ever become competent—violated both the equal protection and the due process clauses of the Fourteenth Amendment. The equal protection clause was implicated because the mere pendency of criminal charges gave the state of Indiana an easier path to the commitment of incompetent individuals and resulted in "a more stringent standard of release than those generally applicable to all others not charged with offenses." 406 U.S. at 730, 92 S.Ct. at 1854. Due process was violated because there was no "reasonable relation" between the "nature and duration of commitment" and "the purpose for which the individual is committed." *Id.* at 738, 92 S.Ct. at 1858.

Indeed, if there is no substantial probability that the IST commitment will result in the defendant's gaining competence in the foreseeable future, the purpose of the commitment is no longer making the defendant competent [22] but rather punishing him for a crime of which he has not been convicted [23] or protecting public safety without going through the civil com-

---

**22.** Ideally, treatment provided to individuals found incompetent to stand trial and confined in IST commitment has different or additional components than are customary for general mental-health patients. *See* Debra A. Pinals, *Where Two Roads Meet: Restoration of Competence to Stand Trial From a Clinical Prospective,* 31 New Eng. J. on Crim. & Civ. Confinement 81, 84–88 (2005). A survey of 151 state psychiatric hospitals listed by the National Association of State Mental Health Program Directors showed that, out of the hospitals that responded, "most facilities that responded ranked medication as the most prevalent intervention to restoration, [but] sixty-six facilities (88%) indicated they used some type of didactic or psychoeducational group intervention for competence restoration ..., and thirty-one facilities (41%) responded that they had competency restoration manuals." *Id.* at 88 (citing C.L. Muller et al., *IST Forensic Mail Survey Results Summary* (2004) (unpublished)).

**23.** Some types of IST commitments have been equated by scholars to "de facto punishment for a crime in which the person was never tried and convicted." Justice Policy Institute, *When Treatment Is Punishment, supra,* at 3 ("For the people who are confined until their charges are required to be dismissed (or a substantial portion thereof), the use of forensic confinement in this way is de facto punishment for a crime in which the person was never tried and convicted.").

mitment process. In those circumstances, the Court held, the state must either release the individual or "institute the customary civil commitment proceedings that would be required to commit indefinitely any other citizen." *Id.* Based on these principles, the Court famously held that an incompetent defendant charged with a crime "cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Id.*

The participants of the HB 795 workgroup appreciated the significance of *Jackson* and its emphasis on restorability in IST commitment determinations. For instance, the Office of the Public Defender urged the House Judiciary Committee to issue a favorable report on HB 795, relying on *Jackson* and arguing that "the Maryland statutory scheme for incompetent defendants does not provide the necessary safeguards [under *Jackson* ] and is, therefore, unconstitutional." State of Md. Office of the Pub. Defender, Position on Proposed Legis.: HB 795 (Feb. 22, 2006). MDLC testified that HB 795 "will bring the statute in compliance by providing periodic reviews and providing the required standard for continuing commitment under the Criminal Procedures Act." MDLC, Testimony in Support of HB 795. Likewise, the Maryland Department of Disabilities focused on the periodic restorability reviews: "People who have psychiatric disabilities who find themselves involved with the courts should be assured that they will not be held as incompetent to stand trial for indefinite periods of time without the benefit of periodic reviews of their competency. This bill addresses that need." Md. Dep't of Disabilities, Position Statement: In Support of HB 795.

Perhaps the most significant among the 2006 amendments was the expansion of CP § 3–106 to (1) exclude from IST commitments defendants who are not dangerous or unrestorable; (2) mandate periodic judicial reviews that not only consider whether a defendant is incompetent but also ensure that the defendant is actually restorable; and (3) require initiation of civil commitment proceedings or proceedings under HG § 7–503. *See* CP § 3–106(b), (c) & (d). The General Assem-

bly also added two other sections to CP § 3–106, one subjecting "the continued retention of a defendant civilly committed" to the provisions of Title 10 of the Health—General Article, and the other instituting periodic hearings for defendants who are incompetent but not dangerous. *See* CP § 3–106(e) & (f).

Although the General Assembly put these safeguards in place in an effort to prevent indefinite IST commitments declared unconstitutional in *Jackson*,[24] Ray argues that the *Jackson* holding requires more. He maintains that "[i]t follows [from *Jackson* ] that if the State seeks to continue to hold such a detainee beyond the manifestly unreasonably long period of five years, it should bear the burden of justifying its decision with proof of a then-present probability of restorability in the near future." Nothing in *Jackson,* however, suggests that the State cannot re-indict a defendant after a CP § 3–107 dismissal unless he has become competent. In fact, the *Jackson* Court expressly refused to consider Jackson's argument that his criminal charges should have been dismissed. 406 U.S. at 739–40, 92 S.Ct. at 1858–59.

The Court took that position even though there was no substantial probability that Jackson would become competent in the near future, and even though the Court considered Jackson's commitment unconstitutional. This demonstrates that the Court viewed pendency of charges as being separate from IST commitment. Indeed, in declining to decide the issue of Jackson's charges, the Supreme Court observed that arguments for a dismissal of charges against an incompetent defendant are usually based on the Sixth Amendment right to a speedy trial, or "the denial of due process inherent in holding pending criminal charges indefinitely over the head of one who will never have a chance to prove his innocence." *Id.*

---

24. We note that we do not decide in this case whether the 2006 amendments actually place the Maryland incompetency statutes in compliance with *Jackson* or whether they are otherwise constitutional. The sole issue before us is whether the State may re-indict a defendant after a CP § 3–107 dismissal, without a showing that the defendant has been restored to competency.

at 740, 92 S.Ct. at 1859. Neither argument, however, was made by Jackson.[25]

## Restorability and 2006 Amendments

Just as there is no support for Ray's argument in *Jackson*, there is also no indication that the General Assembly had any intention to make the State's ability to re-indict a defendant dependent on the defendant's having been restored to competency. The legislators' statements support the view that their concern was the creation of judicial oversight over IST commitments, not limiting the State's ability to re-charge incompetent defendants after a CP § 3–107 dismissal.

When Delegate Dumais introduced HB 795, she characterized it as "necessary" legislation that served three goals: (1) "set[ting] out a process for periodic judicial review of an individual's progress and hearings to determine whether the person continues to meet the commitment criteria;" (2) "plac[ing] a limit on treatment to restore a person to competency to stand trial;" and (3) "address[ing] public safety concerns by allowing the Court, in appropriate circumstances, to have the individual detained in the custody of the Department of Mental Health and Hygiene for consideration of civil commitment." Del. Kathleen M. Dumais, Testimony in Support of HB 795 (Feb. 22, 2006). Delegate Dumais urged the adoption of HB 795 because the previous version of CP § 3–106 "violate[d] due process and fundamental fairness," as it did "not provide a process for review" and provided only one way out of IST commitment, which was when the defendant became competent or was no longer dangerous. In Dumais' opinion, HB 795 "address[ed] a very critical question: How long do we keep these individuals locked up and forgotten?" *Id.*

Likewise, the Floor Report of the Senate Judicial Proceedings Committee summarized the 2006 amendments as dealing primarily with periodic judicial reviews. Although the Report

---

25. Ray did not make these arguments either.

mentioned the dismissal of charges, it said nothing about limits on the State's ability to re-institute charges:

This bill makes several changes to the law regarding incompetency of defendants to stand trial. Changes include extending the availability of incompetency determinations to violation of probation proceedings, and allowing the court to reconsider the incompetency of a defendant at any time before final judgment.

In addition, this bill provides for regular judicial reviews of incompetent to stand trial commitments and includes a procedure, should commitment be terminated, for the individual to be either civilly admitted to a state psychiatric facility or returned to a state residential center under the developmental disability administration.

The bill provides time requirements for dismissal of criminal charges if the defendant remains incompetent to stand trial. The bill also includes a requirement by the Department of Health and Mental Hygiene (DHMH) to submit a report containing a plan for services for individuals being recommended by the Department for a finding of competent to stand trial, incompetent but not dangerous, or not likely to be restored to competency.

Accordingly, we see nothing in the legislative history of the 2006 amendments that would lead us to believe that the General Assembly intended the result Ray advocates. Instead, the legislative history points in one direction: the creation of a rational relation between IST commitments and their purpose, which the General Assembly sought to achieve through mandatory periodic reviews, not by limiting the State's ability to re-indict.

*Mandatory Dismissals and Restorability*

Contrary to Ray's contention, reading the Maryland incompetency statutes in this way does not "render[ ] the time limits of [CP § 3–107(a) ] meaningless." Ray maintains that "[i]f the statute's time limits require nothing more than the ministerial dismissal and refiling of charges every five years ... [s]uch an interpretation is unreasonable as a matter of statutory con-

struction." We disagree. Like Ray and the Court of Special Appeals, we appreciate the significance of the mandatory dismissal deadlines but find them significant for a different reason.

Although the Supreme Court in *Jackson* made clear that incompetent defendants may only remain in IST treatment for the time necessary to determine if they will become competent in the foreseeable future, it declined to indicate what this "necessary" or "reasonable" time may be. 406 U.S. at 738, 92 S.Ct. at 1858. Forty years later, there is still no consensus among psychiatrists or states' legislatures on this issue.

The concept of restorability remains relatively new in the field of forensic psychiatry because the research in this area did not begin until the Supreme Court's decisions in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (affirming a defendant's right to have a competency evaluation prior to trial) and *Jackson v. Indiana*. George F. Parker, *The Quandary of Unrestorability*, 40 J. Am. Acad. Psychiatry & L. 171, 171 (2012). Although many states use *Jackson*'s phrase "substantial probability" when discussing restorability, "there is no agreed-upon definition of substantial probability" in the psychiatric literature. *Id.* at 174. There is also no "consensus in the literature as to when a defendant can be called unrestorable or which disorders might qualify a defendant for this finding." [26] *Id.*

What further complicates restorability findings is that factors other than a defendant's mental state affect those determinations. Research shows that " '[p]revious criminal history and a current violent charge are significantly related to restor-

---

**26.** Some medical writers have concluded that "there is reasonably strong evidence that defendants who have chronic psychotic disorders and a history of poor response to treatment, as well as defendants with mental retardation, have a significantly decreased chance of successful restoration." George F. Parker, *The Quandary of Unrestorability*, 40 J. Am. Acad. Psychiatry & L. 171, 171 (2012) (citing Douglas Mossman, *Predicting Restorability of Incompetent Criminal Defendants*, 35 J. Am. Acad. Psychiatry & L. 34 (2007) and Douglas R. Morris & George F. Parker, Jackson's *Indiana: State Hospital Competence Restoration in Indiana*, 36 Am. Acad. Psychiatry & L. 522 (2008)).

ability predictions.' " J.W. Looney, *The Arkansas Approach to Competency to Stand Trial: "Nailing Jelly to a Tree"*, 62 Ark. L.Rev. 683, 700 (2009) (alteration in original) (quoting Karen L. Hubbard & Patricia A. Zapf, *The Role of Demographic, Criminal, and Psychiatric Variables in Examiners' Predictions of Restorability to Competency to Stand Trial*, 2 Int'l J. Forensic Mental Health 145, 153 (2003)). This may be so because " 'examiners are subjected to more political pressure to have violent offenders with previous criminal histories prosecuted which, in turn, could result in more predictions as being restorable for defendants with violent, criminal histories.' " *Id.* at 700 n. 144 (quoting same).

Additionally, because restorability literature suggests that a high percentage of defendants can be restored to competency,[27] "clinicians will over-predict restorability." Debra A. Pinals, M.D., *Where Two Roads Meet: Restoration of Competence to Stand Trial From a Clinical Prospective*, 31 New Eng. J.Crim. & Civ. Confinement 81, 105 (2005). But "even when a forensic evaluator writes that it is unlikely or very unlikely that a defendant will be restored to competence, court participants may well conclude that it is still possible the defendant will be restored and thus deny designation as unrestorable." Parker, *supra*, at 174.

---

**27.** "Overall, the competence restoration literature supports that between eighty and ninety percent of defendants with mental illness will be able to be restored to competence, and generally, this restoration has been achieved in a period of less than six months." Pinals, *supra*, at 104. Specifically, several studies show that "70 percent or more become competent within six months of starting treatment; nine out of 10 will be restored within a year." Justice Policy Institute, *When Treatment Is Punishment, supra*, at 13 (footnote omitted). For instance, an Oklahoma-based study "found that the average length of stay for people who were restored to competency was 63.7 days; less than 6 percent of the subjects had a length of stay greater than six months." *Id.* (citing Robert A. Nicholson & John L. McNulty, *Outcome of Hospitalization for Defendants Found Incompetent to Stand Trial*, 10 Behav. Sci. & L. 371, 371–83 (1992)). Another study "that reviewed 18 years of data in Indiana found that 72.3 percent of people" in IST commitment "were restored within six months and 83.9 percent restored within one year." *Id.* (citing Morris & Parker, *supra*, at 522–34).

In the midst of this uncertainty of what "substantial probability" of becoming competent means or how to predict whether an individual is restorable, states have taken different approaches in their efforts to comply with *Jackson*. Many states placed express limits on how long an incompetent defendant may remain in IST commitment for the purposes of determining her restorability. In several of these states, the length of a maximum IST commitment does not depend on the crime charged.[28] Other states tie the length of the maximum IST commitment to the maximum length of the sentence for the charged crime.[29] The length of permissible IST commitment varies in this group of states as well. Some states, like Colorado, allow IST commitment up to the length of the maximum possible sentence, while others, like Ohio, create a tier system that assigns certain time periods to certain crime categories.[30]

Other states, in addition to or instead of express limitations on the length of competency treatments, permit or require a dismissal of charges against incompetent defendants.[31] In

---

**28.** These states include Arkansas, Idaho, and Indiana, among others. *See, e.g.*, Ark.Code Ann. § 5–2–310(b)(1), (b)(2)(A) (2006 & Supp.2011) (report after ten months and hearing after a "reasonable period of time," but not more than one year of commitment); Idaho Code Ann. § 18–212(2) (2004) (ninety days and at court's discretion for an additional 180 days); Ind.Code Ann. § 35–36–3–3(b)(2) (LexisNexis 2012) (six months).

**29.** These states include the District of Columbia, among others. *See, e.g.*, D.C.Code Ann. § 24–531.05(d)(1) (Supp.2012) ("[I]npatient treatment may last no longer than the maximum possible sentence that the defendant could have received if convicted of the pending charges.").

**30.** *Compare* Colo.Rev.Stat. Ann. § 16–8.5–116(1) (Supp.2012) ("A defendant committed to the department or otherwise confined as a result of a determination of incompetency to proceed shall not remain confined for a period in excess of the maximum term of confinement that could be imposed for the offenses with which the defendant is charged . . . ."), *with* Ohio Rev.Code Ann. § 2945.38(C)(1)-(4) (LexisNexis 2010 & Supp.2012) (limiting the duration of IST treatment from thirty days for certain misdemeanors to one year for certain felonies).

**31.** For instance, in North Carolina prosecutors may "enter a dismissal with leave," which "results in removal of the case from the docket of

other states, there is no express limitation on the length of IST commitment, but there is a provision for discretionary or mandatory dismissal. For example, the Florida legislature mandates that the charges be "dismissed without prejudice to the state if the defendant remains incompetent to proceed 5 years after" he was first found incompetent to stand trial.[32] Fla. Stat. Ann. § 916.145 (West 2011 & Supp.2013).

■ Our incompetency statutes fall into the category of the statutes that control the length of IST commitments through a mandatory dismissal of charges upon expiration of time. Although tying dismissal deadlines to the charges may not be the ideal approach,[33] it does provide a bright-line rule that may be appropriate, considering the uncertainty surrounding restorability determinations. By mandating dismissals upon the expiration of ten, five, and three years—regardless of whether the psychiatrists still deemed the defendant restora-

---

the court, but all process outstanding ... retains its validity, and all necessary actions in the case may be taken," including "reinstitut[ing] the proceedings" when the prosecutor "believes the defendant may soon become capable of proceeding." N.C. Gen.Stat. § 15A–1009 (2011). Such a dismissal with leave, however, loses its effect, if a court exercises discretion to dismiss the case, which it may do at any time in certain instances. *Id.* § 15A–1008.

**32.** Unlike our CP § 3–107, the Florida statute gives courts the discretion not to dismiss the charges if "the court in its order specifies its reasons for believing that the defendant will become competent to proceed within the foreseeable future and specifies the time within which the defendant is expected to become competent to proceed." Fla. Stat. Ann. § 916.145 (West 2011 & Supp.2013). Furthermore, unlike CP § 3–107, the Florida statute expressly provides that "[t]he charges against the defendant are dismissed without prejudice to the state to refile the charges should the defendant be declared competent to proceed in the future." *Id.*

**33.** There has been criticism of tying a defendant's charges or potential sentence to the length of permissible IST commitment. *See, e.g.,* Grant H. Morris & J. Reid Meloy, *Out of Mind? Out of Sight: The Uncivil Commitment of Permanently Incompetent Criminal Defendants,* 27 U.C. Davis L.Rev. 1, 18 (1993) ("Because progress in treatment cannot be measured by the seriousness of the criminal charge, statutes authorizing treatment for the maximum possible sentence are not compatible with the Court's progress requirement.").

ble—the General Assembly created the upper limit on how long the State may attempt to work toward the goal of making an incompetent defendant become competent, at least with respect to that indictment. Accordingly, on this point, we agree with the Court of Special Appeals: "The dismissal deadlines in section 3–107(a) provide yardsticks for measuring 'the reasonable period of time necessary to determine whether [a defendant is restorable].' " *Ray II,* 204 Md.App. at 435–36, 41 A.3d at 582 (citation omitted).

■■■ But we do not draw the same conclusion from this acknowledgment as did the intermediate appellate court. That the dismissal deadlines are statutory cutoffs for restorability determinations does not mean that the State may not re-indict such an individual unless he has been restored to competency. What these dismissal deadlines are is the General Assembly's way of saying that—if a defendant, charged with a particular crime and placed in IST commitment, does not become competent within ten, five, or three years depending on the severity of the crime—there is no substantial probability that the defendant will become competent in the foreseeable future. In other words, the passage of time in IST treatment—without the defendant's gaining competency—and the resulting dismissal under CP § 3–107 create the presumption that the defendant is not restorable.

This reading of CP § 3–107 reconciles, on the one hand, the requirement of CP § 3–107(a) that charges be dismissed upon expiration of time; with, on the other hand, the provision of CP § 3–107(b) that any dismissal be "without prejudice." Even more importantly, such a reading of CP § 3–107 carries out the General Assembly's intent of making sure that unrestorable defendants are not "locked up and forgotten." Del. Dumais, *supra.*

Accordingly, the statutorily-mandated dismissal of charges under CP § 3–107 gives the State an opportunity to re-evaluate its case against the defendant and the likelihood that the case would ever go to trial. It is possible that, considering the defendant's prolonged incompetency, the State may decide

not to re-indict at all. In that case, the individual against whom the charges were dismissed will be considered for civil commitment in accordance with the civil commitment provisions of Title 10 of the Health—General Article. Alternatively, the State may re-indict an individual after the dismissal of the original charges, as it did in this case. If the State chooses to do that, the presumption that the defendant is unrestorable, stemming from the CP § 3–107 dismissal, remains, but is rebuttable by the State.

Although CP § 3–106(b) does not require that a restorability determination be made before the initial IST commitment,[34] not looking into restorability in a situation such as the one before us would render meaningless the mandatory dismissal provision of CP § 3–107. After all, a defendant who comes before a court after his charges were re-instituted has already spent at least three, five, or ten years in IST commitment; and in accordance with CP § 3–107, the maximum amount of time in IST commitment has already passed.

The Court of Special Appeals incorrectly assumed in this case that it was established in 2010 that Ray "might be restored to competency with supervised medication and treatment." *Ray II,* 204 Md.App. at 429, 41 A.3d at 578. In reality, neither Ray's counsel, the State, nor the Circuit Court brought up the issue of whether Ray was actually restorable after nine years of unsuccessful IST treatment and in light of his original charges having been dismissed under CP § 3–107. The Circuit Court should make that determination on remand.

Thus, we vacate the Court of Special Appeals' ruling and remand this case to the Court of Special Appeals with directions to affirm the Circuit Court's denial of Ray's motion to

---

**34.** CP § 3–106(b) provides that "if the court finds that the defendant is incompetent to stand trial and ... is a danger to self or the person or property of another, the court may order the defendant committed to the facility that the Health Department designates." The initial determination to place an incompetent defendant in IST commitment without a restorability finding may be proper because at the time of the initial incompetency determination a defendant's restorability may be unknowable. *See, e.g.,* Pinals, *supra,* at 101–02.

dismiss charges and remand this case to the Circuit Court so that it may make the required restorability determination and proceed in accordance with this opinion.

### Conclusion

Ray and the Court of Special Appeals attributed Ray's continued IST commitment to the State's re-institution of charges. They read the dismissal deadlines of CP § 3–107 as a prohibition against re-indictment of an incompetent defendant after his charges were dismissed under CP § 3–107. But CP § 3–107 expressly provides that a dismissal of charges is without prejudice. There is no indication in the legislative history that, by mandating dismissals, the General Assembly sought to impose a limitation on the State's power to re-indict.

Nevertheless, Ray's current IST commitment is not proper. The dismissal deadlines of CP § 3–107 set limits on how long the State may confine an incompetent defendant for the purpose of determining whether he is restorable. Thus, the passage of five years without Ray's becoming competent and the resulting dismissal of his original charges under CP § 3–107 created the presumption that Ray could not be restored to competency. The State may overcome that presumption after re-indictment, but ordering Ray in IST commitment, while the presumption that he was unrestorable was in place, was in error.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE HARFORD COUNTY CIRCUIT COURT'S DENIAL OF MOTION TO DISMISS CHARGES AND REMAND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY BETWEEN PETITIONER AND RESPONDENT.**